Ricky Lee UPTON *v.* STATE of Arkansas

CR 00-530 36 S.W.3d 740

Supreme Court of Arkansas
Opinion delivered February 1, 2001

*Robert T. Rogers, II*, Carroll County Public Defender, and *Charles Scott Jackson*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Misty Wilson Borkowski*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Ricky Upton appeals from a judgment of conviction for first-degree murder and theft of property for which he received a sentence of life imprisonment plus sixty months, to run concurrently. He raises two issues on appeal: (1) his second statement given to law enforcement officers was made without *Miranda* warnings and, therefore, was involuntary and inadmissible; and (2) the photograph of the victim allowed into evidence by the trial court was more prejudicial than probative and, thus, was inadmissible. The points raised have no merit, and we affirm.

This appeal arises from events occurring in the late hours of June 3, 1998, near Beaver Lake in Carroll County. What transpired was described at trial in large part by Brian Conner and Captain J.R. Ashlock, chief investigator of the Carroll County Sheriff's Office. Earlier that day, Ricky Lee Upton, age 19, and his friend, Brian Conner, waited in Alpena to be picked up by the victim, Erik Shelton, who had a truck. Although the two expected Shelton to arrive sometime around 12:00 p.m., he failed to pick them up until around 1:30 p.m. Conner testified at trial for the State, and on cross-examination, he admitted that the victim's tardiness angered Upton to the point that he commented to Conner that he was going to kill Shelton.

Shelton picked up Upton and Conner in Alpena, and the three drove to Eureka Springs. There, between 4:30 p.m. and 5:00 p.m., they bought some liquor and beer. Sometime around dusk, after telling several people of their "party," the three drove to a Beaver Lake campsite area where they encountered other campers, whom they also invited to their party. Later in the evening, two of their

friends, Eric Clanny and his girlfriend, Lindsey Post, arrived. The drinking continued. According to campers at a nearby campsite, the Upton group was noisy and "rowdy." Eric Clanny and Lindsey Post went off to be alone together, leaving Upton, Shelton, and Conner at the campsite. Although the time sequence of the following events is somewhat unclear from the record, at some point, Shelton decided that he was tired and went to rest in his truck. While Shelton was sleeping, Upton again told Conner that he wanted to kill Shelton. Shelton emerged from the truck and said he wanted to leave. This resulted in an argument between Shelton and Upton. According to Conner, the three stood near the campfire. Upton grabbed a steel pipe that was in the back of Shelton's truck and struck the victim in the back of his head, knocking him to the ground. While he lay there on his back, Upton struck him several more times in the face. He encouraged Conner to do the same, and Conner refused. Upton then asked Conner to help roll the victim's body down to the lake, which he did.

Before rolling Shelton's body into the lake, Upton took money from the victim's wallet. Conner threw the steel pipe and the victim's wallet into the lake. The two men then went back to the campsite, gathered their other two friends, and drove back to Eureka Springs in the victim's truck. After dropping off Eric Clanny and Lindsey Post, Upton and Conner drove to Conner's home and hid the truck under a tarpaulin. At about 5:30 a.m., Upton asked Conner's father to drive the two men to Upton's home, where he lived with his aunt and uncle. Conner's father did so, and when they arrived, Upton and Conner went to sleep. After awaking around 11:00 or 11:30 a.m. on June 4, 1998, Conner and Upton took off their clothes which had blood on them and put them in a trash bag. At around 11:30 a.m. that same day, the victim's body was found at Beaver Lake and the investigation into his death began.

That evening at approximately 8:30 p.m. or 9:00 p.m., Detective Leighton Ballard of the Carroll County Sheriff's Office went to the home of Upton's uncle where the two men were and asked that Upton and Conner come to the Sheriff's office to answer some questions concerning their investigation into Shelton's murder. At that time, according to Detective Ballard, Upton was not a suspect, and Ballard advised Upton that he was not in trouble. Upton, Conner, and Upton's uncle (Ralph Suggs) said they would go to

the Sheriff's office after they ate dinner. At about 10:00 p.m., they went to the Sheriff's office. While there, Captain Ashlock instructed Upton that he was there voluntarily, that he was not under arrest, and that he was free to leave at any time. [1] Upton was also given his *Miranda* warnings. Captain Ashlock then began alternating his questioning of Conner and Upton. Upton gave two statements. In the first, following the *Miranda* warnings, he disavowed any knowledge of or complicity in the murder. However, after Captain Ashlock told Upton that Conner had placed him at Beaver Lake, Upton changed his story and confessed that he killed Shelton by hitting him once with a steel pipe. The whole interview process lasted from approximately 10:55 p.m. until 1:00 a.m. the next morning. It culminated in the Sheriff's deputies' obtaining consent from both Upton and Ralph Suggs to search their residence. Suggs testified at the later suppression hearing that he left the Sheriff's office somewhere between 3:00 a.m. and 4:00 a.m., on the morning of June 5, 1998.

On June 10, 1998, Upton initiated a third interview with Captain Ashlock, and was again given his *Miranda* warnings. This time he acknowledged once more that he had killed Shelton.

As a result of his statements, Upton was charged with first-degree murder and theft of Shelton's truck. Subsequently, he filed a motion to suppress his second statement. Following the denial of his motion to suppress this statement, Upton was tried in a three-day jury trial, convicted of both charges, and sentenced to life imprisonment plus five years.

### I. Involuntary Statement

Upton argues for his first point that between his first and second statements, Captain Ashlock interviewed Brian Conner, learned of Upton's complicity in the murder, and that changed Upton's status from voluntary witness to that of suspect. He maintains that this change in status caused him to be "in custody," because his liberty was now curtailed. He points out that the size of the room, approximately 6 1/2 feet by 14 feet, the fact that Captain Ashlock was blocking the only exit, and the tone of the interrogation made the second interview one that was much more "accusa-

---

[1] Captain Ashlock has since left employment at the Carroll County Sheriff's Office.

tory." Because he had cause to believe that Conner had implicated him, Upton claims that a reasonable person in his shoes would have thought his freedom was curtailed. In short, he concludes that at the time of the second interview when his status had changed from voluntary, potential witness to in-custody suspect, he should have been read his *Miranda* rights again.

■ This Court reviews a trial judge's ruling on a motion to suppress by making an "independent determination based upon the totality of the circumstances, viewing the evidence in a light most favorable to the State." *Wright v. State*, 335 Ark. 395, 403-04, 983 S.W.2d 397, 401 (1998) (citing *Tabor v. State*, 333 Ark. 429, 971 S.W.2d 227 (1998)). The trial court's ruling will only be reversed, if it is clearly against the preponderance of the evidence. *See id.*

■ The initial question for us to resolve in our analysis is when was Upton taken into custody. In *Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999), this Court quoted from a prior decision in which we discussed what constituted custodial interrogation:

> It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984), citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). Stated another way, the Supreme Court defined custodial interrogation as meaning the questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of action in any significant way. *Miranda v. Arizona*, 384 U.S. 436, 444 (196[6]); *see also Stansbury v. California*, 114 S. Ct. 1526 (U.S. 1994) (per curiam); and *Oregon v. Mathiason*, 429 U.S. 492 (1977) (per curiam). The Supreme Court further explicitly recognized that *Miranda* warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Beheler*, 463 U.S. at 1125. In resolving the question of whether a suspect was "in custody" at a particular time, the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being interrogated. *Stansbury*, 114 S. Ct. at 1529.

*Riggs*, 339 Ark. at 118, 3 S.W.3d at 309 (1999) (quoting *State v. Spencer*, 319 Ark. 454, 457, 892 S.W.2d 484, 485 (1995)).

We agree that Upton's status did change between the first and second interviews for the reasons he stated. Indeed, Captain Ashlock appeared to confirm that. Nevertheless, we do not view that fact as pivotal to our resolution of this issue. This court has not addressed the precise issue of the continued effectiveness of *Miranda* warnings to a voluntary witness whose status changes during the interview process to suspect. We have, however, held that a trial court was not clearly erroneous in finding a second statement made by an accused voluntary though there had been a hiatus of two days since the first *Miranda* warnings. *Upton v. State*, 257 Ark. 424, 516 S.W.2d 904 (1974). *See also Whitmore v. State*, 296 Ark. 308, 756 S.W.2d 890 (1988) (no *Miranda* violation when warnings given to a suspect at 3:00 a.m. and statement taken without fresh warnings two days later).

 The Supreme Court of Connecticut, however, has decided the precise issue that confronts us today. *See State v. Burge*, 195 Conn. 232, 487 A.2d 532 (1985). In that case, Burge, who was not a suspect, was fully informed of his *Miranda* rights and executed a written waiver of those rights after he arrived at police headquarters voluntarily between 4:15 and 4:30 p.m. His status changed due to statements made in a subsequent interrogation and after a visit to the crime scene with police. When Burge returned to police headquarters at around 7:00 p.m., his *Miranda* warnings were repeated in part. He then provided police offices with a written statement, which was completed, read, and signed by 8:30 p.m. Burge argued on appeal that the *Miranda* warnings he received in the early afternoon were inadequate to validate the confessions he gave four hours later.

The Supreme Court of Connecticut disagreed and said:

> The disclosure that *Miranda* requires must be made no later than the time when an accused is taken into custody. When the police are conducting a good faith precustodial investigation at police headquarters, they may have difficulty in determining the precise moment when questioning turns into custodial interrogation and Miranda warnings are required. Although the uncertain line between questioning and custodial interrogation does not excuse late warnings, it does provide a justification for the validity

of good faith early warnings which are sufficiently proximate to formal custody to alert the person being questioned to the importance of these constitutional rights.

....

In this case, the defendant was continuously in the company of the police, was questioned on the same subject by the same officers throughout that time, and confessed within four hours of having been given the warnings. The defendant's mental condition was not shown to have so affected his memory or faculties as to render the earlier warnings ineffective. In these circumstances, we conclude that the initial warnings performed their constitutionally mandated function even though they were issued prior to the time the defendant was in custody or had become a suspect.

*Burge*, 195 Conn. at 247-49, 487 A.2d at 543 (citations omitted).

■ In the case before us, Upton was in the company of Sheriff's investigators from approximately 10:00 p.m. until 3:00 or 4:00 a.m. He was questioned on the same subject by the same officer during the two-hour period that he was interviewed and confessed within two hours of being given his *Miranda* warnings. Nothing in the record demonstrates that his mental condition was such that he did not understand the warnings. As was the case in *State v. Burge, supra*, it is clear to us that the *Miranda* warnings Upton received and the waiver he executed were adequate and sufficient. There was no Fifth Amendment violation, and we affirm the trial court on this point.

### II. Prejudicial Photograph

For his second point, Upton contends that the State introduced a photograph of the victim (State's Exhibit 10) that was particularly gruesome. He further maintains that State's Exhibit 10 inflamed the jury and that its probative value was substantially outweighed by prejudice to him. *See* Ark. R. Evid. 403. He asserts that the photograph does not in any way depict the position of Shelton's body at the time of the blows to the head and that it sheds no light on whether Upton acted purposefully in causing the death of the victim. *See* Ark. Code Ann. § 5-10-102 (Repl. 1997). Hence, he concludes, State's Exhibit 10 should have been excluded.

█ We do not agree. In *Stewart v. State*, 338 Ark. 608, 999 S.W.2d 684 (1999), this Court discussed the general principles surrounding the admission of photographs at trial:

> Ark. R. Evid. 403 (1999) permits the exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. Accordingly, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Ark. R. Evid. 403.
>
> This court will not reverse a trial court for admitting photographs absent an abuse of discretion. *Jones v. State*, 329 Ark. 62, 65, 947 S.W.2d 339, *cert. denied*, 118 S. Ct. 574 (1997). In *Jones*, we discussed the guidelines for determining whether a trial court has abused its discretion by admitting photographs. For example, although we are highly deferential to a trial court's discretion, we have rejected a *carte blanche* approach to the admission of photographs. *Jones*, 329 Ark. at 65, 947 S.W.2d at 340 (quoting *Camargo v. State*, 327 Ark. 631, 940 S.W.2d [464] (1997) (internal citations omitted)). In making the admission determination, we require a trial court to consider, first, whether the relevant evidence creates a danger of unfair prejudice, and, second, whether the danger of unfair prejudice substantially outweighs its probative value. *Jones*, 329 Ark. at 66, 947 S.W.2d at 341 (quoting *Camargo v. State*, 327 Ark. 631, 940 S.W.2d [464] (1997) (internal citations omitted)).
>
> Significantly, after applying the Rule 403 balancing test, we have held that even the most gruesome photographs may be admissible if they tend to shed light on any issue, to corroborate testimony, or if they are essential in proving a necessary element of a case, are useful to enable a witness to testify more effectively, or enable the jury to better understand the testimony. Other acceptable purposes are to show the condition of the victim's body, the probable type or location of the injuries, and the position in which the body was discovered. Obviously, when a photograph serves no valid purpose and could only be used to inflame the jury's passions, it should be excluded. *Jones*, 329 Ark. at 66, 947 S.W.2d at 341 (quoting *Camargo v. State*, 327 Ark. 631, 940 S.W.2d [464] (1997) (internal citations omitted)).

*Stewart*, 338 Ark. at 617-18, 999 S.W.2d at 690.

Here, State's Exhibit 10 depicts the victim's head and upper torso and the injuries he sustained in graphic detail. The trial court

ruled that the photograph was helpful to the jury in determining the severity of the blows the victim received and whether one or more blows was administered in the murder. The number of blows and their severity, of course, are highly relevant to the jury's understanding of the crime. State's Exhibit 10 is gruesome, but that does not decide the issue. The photograph was also probative and had value for the jury. We hold that the trial court did not abuse its discretion in admitting the photograph into evidence.

The record in this matter has been reviewed for other error in accordance with Ark. Sup. Ct. R. 4-3(h), and no reversible error has been found.

Affirmed.