Melissa TIPTON *v.* Zeb Taylor AARON

CA 03-932 185 S.W.3d 142

Court of Appeals of Arkansas
Divisions I and II
Opinion delivered June 16, 2004

3

*John W. Walker, P.A.*, by: *John W. Walker*; *Arrington Law Firm*, by: *Claudene T. Arrington*; and *Terrence Cain*, for appellant.

*Keil & Goodson,* by: *John C. Goodson,* for appellee.

JOHN F. STROUD, JR., Chief Judge. This is an unusual custody case. The child is Colten Rance Tipton, who was born out of wedlock in November 1995. His mother is Mellisa Tipton, appellant, and it is undisputed that his father is Zeb Aaron, appellee, both of whom were minors at the time of the birth. Mellisa's parents, Billy and Tina Tipton, were appointed guardians of the child in January 1996 because of the minor status of the parents. Zeb and his parents have been involved in the child's life since his birth, but have made no significant financial contributions toward his support. Zeb did not initiate paternity proceedings until June 2002, when the Tiptons and the child moved to Virginia Beach, Virginia, because Billy Tipton had lost his job, was not able to find work in or around Hope, and had learned of an employment opportunity in Virginia Beach. As a part of the paternity proceedings, Zeb sought custody of the child and, in turn, Mellisa, in her response, also sought custody. The maternal-grandparent guardians took the position that it was time for them to relinquish their guardianship and that it would be preferable for custody to be granted to their daughter, Mellisa. At the conclusion of the final hearing in this matter, the trial court awarded custody of the child to Zeb. On appeal, Mellisa contends that the trial court clearly erred in awarding custody to him. We reverse and remand.

As part of her overall contention that the trial court's award of custody to Zeb was against the clear preponderance of the evidence, Mellisa argues that the trial court used an impermissible basis for deciding custody. In *Palmore v. Sidoti,* 466 U.S. 429 (1984), the United States Supreme Court held that private racial biases and the possible injury that they might inflict are not permissible considerations for the removal of a child from the custody of its natural mother. The Court explained:

> It would ignore reality to suggest that racial and ethnic prejudices do not exist or that all manifestations of those prejudices have been eliminated. There is a risk that a child living with a stepparent of a different race may be subject to a variety of pressures and stresses not present if the child were living with parents of the same racial or ethnic origin.
>
> The question, however, is whether the reality of private biases and the possible injury they might inflict are permissible considerations for removal of an infant child from the custody of its natural mother.

We have little difficulty concluding that they are not. The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. "Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held."

466 U.S. at 433 (citations omitted).

■ At trial, appellee elicited testimony about the fact that Mellisa's husband, Justin, is biracial; that she is pregnant with Justin's child; and that her three-year-old daughter is also biracial, while Colten is Caucasian. In addition, appellee presented witnesses who testified, generally, that it would concern them for Colten to be placed in an interracial household. This line of inquiry can be fairly said to have permeated the hearing, yet no objection was raised. At the conclusion of the testimony, the trial court asked if the parties were "aware of any law or cases dealing with, in Arkansas specifically, a child not of an interracial marriage being placed into an interracial marriage," and the parties responded that they were not. In ruling from the bench, the trial court commented that the fact that Mellisa's home was biracial "should not have any bearing whatsoever on the fact that Colten has been around there and has had a good home there." He went on to say, however, "I do believe that it will create problems for him in the future." Clearly, to the extent that the trial court might have relied upon such a basis in awarding custody to Zeb, it would have been error to do so. However, because no objection in this regard was raised below, it was not preserved for our review. Our law is well settled that issues raised for the first time on appeal, even constitutional ones, will not be considered. *London v. State*, 354 Ark. 313, 125 S.W.3d 813 (2003). We therefore do not decide the case on that basis.

■ In child-custody cases, we review the evidence *de novo*, but we do not reverse the findings of the trial court unless it is shown that they are clearly contrary to the preponderance of the evidence. *Durham v. Durham*, 82 Ark. App. 562, 120 S.W.3d 129 (2003). A finding is clearly against the preponderance of the evidence, when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Sheppard v. Speir*, 85 Ark. App. 481, 157

S.W.3d 583 (2004). In custody cases, the primary consideration is the welfare and best interests of the child involved, while other considerations are merely secondary. *Eaton v. Dixon*, 69 Ark. App. 9, 9 S.W.3d 535 (2000); Ark. Code Ann. § 9-13-101(a) (Supp. 2003) (award of custody shall be made without regard to the sex of the parent, but solely in accordance with the welfare and best interest of the child). Custody awards are not made or changed to gratify the desires of either parent, or to reward or punish either of them. *Durham v. Durham, supra*. We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases. *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999).

 Usually, when we address cases involving change of custody, a child is being moved from one parent to another. In those cases, the original decree is a final adjudication that one parent or the other was the proper person to have care and custody of the children. *Carver v. May*, 81 Ark. App. 292, 101 S.W.3d 256 (2003). Custody should not be changed unless conditions have altered since the decree was rendered or material facts existed at the time of the decree but were unknown to the court, and then only for the welfare of the child. *White v. Taylor*, 19 Ark. App. 104, 717 S.W.2d 497 (1986). For a change of custody, the chancellor must first determine that a material change in circumstances has occurred since the last order of custody; if that threshold requirement is met, he must then determine who should have custody with the sole consideration being the best interest of the children. *Schwarz v. Moody*, 55 Ark. App. 6, 928 S.W.2d 800 (1996). This court has further held that its reasons for requiring more stringent standards for modifications than for initial custody determinations are to promote stability and continuity in the life of the child, and to discourage the repeated litigation of the same issues. *Lloyd v. Butts*, 343 Ark. 620, 37 S.W.3d 603 (2001). Of course, whether an initial proceeding or a modification proceeding, the polestar remains the best interest and welfare of the child. *Id*.

 Here, we have something of a hybrid situation in that a change of custody was sought and granted, but it was a change from the custody of the guardian maternal grandparents to the father, rather than a change between parents. That is, it is a change of custody, but neither of the parents to whom custody might have been awarded have had legal custody in the past. Both parties seem

to agree that even in this unusual situation, a material change of circumstances must be established. To the extent that such a change must be shown under these circumstances, we find that the requirement is clearly satisfied. The natural parents are older, they are no longer minors, and they seek to assume the care and custody of Colten. In addition, the maternal guardian grandparents seek to relinquish that role. Accordingly, the lower court's primary focus was appropriately on the best interests of the child, and, on appeal, we must decide whether he clearly erred in awarding custody to Zeb. After a careful *de novo* review of the evidence in this case, we are left with a definite and firm conviction that a mistake has been made.

At the February 5, 2003 hearing, Billy Tipton, Colten's maternal grandfather, testified that he and his wife were Colten's guardians. He explained that he and his wife, Tina, and Mellisa had moved to Virginia Beach, Virginia, approximately eight months earlier and that Colten was in the first grade. He acknowledged that he and his wife were asking the court to award custody of the child to someone other than themselves. He stated that his daughter, Mellisa, had gotten married on January 25, 2003, to Justin Reliford; that Justin was from Hope, Arkansas; and that he was twenty-four or twenty-five years old. He stated that Justin had no criminal record and that he was "mixed," black and white. He said that Colten was not an interracial child. He acknowledged that Mellisa had used marijuana when she was younger. He explained that Colten's absences from school were due to missing a week for the October hearing, three days for strep throat when they returned to Virginia, two "snow days," and a week for the current hearing. He explained the problems that Colten was having in school and the efforts that they were making to improve his school work. He also explained that they were working with his teacher and that they were having him see a counselor to help him deal with the custody matters.

Mr. Tipton stated that he and his wife wanted the guardianship terminated, but that they were available to help if the court should determine that neither of the parents was ready to assume responsibility. He stated that he did not know of anything that would be harmful if Mellisa had custody and that she was "pretty level headed." He said that he had concerns about Zeb because he was a convicted felon and had a track record of "getting on the wagon and jumping off." He said that he was concerned about the way Colten would be raised with Zeb; that he had seen children in

Zeb's family "threatened with the law" if they do something wrong, which was not the way a child should be raised; and that it scared him. He said that the values they have instilled in Colten for seven years "could be torn down in seconds."

Mellisa Tipton, the child's mother, testified that she had recently married Justin Reliford; that he was "interracial" but Colten was not; and that they live in a two-bedroom apartment, along with her three-year-old daughter, who is also biracial. She said that she had no reservations about raising a Caucasian child in an interracial marriage. She acknowledged that she had used marijuana in the past, but not around the child, and that the last time she had done so was about a year ago. She stated that her explanation for Colten's poor grades was that he was under a lot of stress about the court proceedings, but that she and her mother and father were working with him and he was getting better. She stated that she does not consult with his teachers directly because her parents are listed as the guardians on the papers at school, but that her parents tell her daily what is going on. Mellisa explained what her husband does for a living and that Justin and Colten have a very good relationship. She stated that she has no record of convictions and that she no longer smokes. She stated that she does not foresee any problems with raising a child in an interracial household. She also explained that where they live in Virginia, there are a lot of biracial children and interracial couples. She said that Colten fits in well there.

Mellisa stated that her main concern about Zeb being granted custody is that he would teach Colten to hate his sister because when Colten returns from visits he says his sister has "cooties." She also stated her concerns about Zeb's problems with drugs and that Colten might "get hold of some." She explained that Zeb had been convicted and served time for possession of drugs and that he went to rehab but had then relapsed about a year or year and a half ago. She said that one time when Colten was very young, he had called and said that his dad was asleep on the couch and he couldn't wake him. She said that she stayed on the phone with him until her parents were able to get to Zeb's house. She said that happened before Zeb ever served time for possession.

Mellisa testified that since high school, she has worked most of the time and that she has contributed to Colten's support. She said that except for eight months of the seven years since Colten was born, she had lived in her parents' house, that she had bought clothes for Colten, that she had helped with the costs of food, and

that she had helped with Colten's care. She stated that she now lives about fifteen minutes from both the school and her parents' house, and that her parents would continue to keep both Colten and his sister after school while she worked. Mellisa stated that she wants Colten to respect everybody no matter what color, and that she does not think that would happen with Zeb, and that she wants Colten to show respect, for example by saying "yes ma'am" and "yes sir," and that does not happen with Zeb. She stated that she does not like name calling and saying "stupid, idiot and shut up," but that such terms are used at Zeb's house. She stated, however, that she does want Colten to spend time with Zeb and his family when it does not affect his schooling. Mellisa testified that she is paid every two weeks and that her take home pay is between $500 and $600.

Appellee then presented his case. Janice Quillen testified that she has known Zeb since he was a baby; that she has observed Zeb and Colten together; and that their relationship is warm, loving, and caring. She said that it concerns her that the child might be placed in an interracial household with the mother and that he would be better off with the father.

Lynn Kimball testified that she works at Springhill High School; that she has known Zeb for eleven years; and that she has observed the loving relationship among Colten, Zeb, and Zeb's family. She said that it would concern her for Colten to be placed in an interracial household; that she did not understand why anyone would be put in that situation because of the "different cultures between Colten being Caucasian and the stepfather being black"; that she thinks it would cause difficulties in raising Colten; and that she based that opinion on her personal observations in working in the school system.

Judy Kay Kidd testified that she has known Zeb since kindergarten; that she has observed his loving relationship with Colten; and that it would concern her for Colten to be placed in a biracial home.

Alicia Aaron Reed, Zeb's sister, testified that Zeb loves Colten dearly; that she would have problems with Colten being placed in a biracial home; and that "that's what we're here to prevent." She stated that Zeb was past his drug problems; that "in this part of the country" a biracial home is not highly accepted; and that it is becoming more common in other parts of the country.

Zeb Aaron, the child's father, testified that he works at Klipsch in Hope, Arkansas. He said that he has worked there for

approximately six months and that prior to that he worked at Meyer's Bakeries. He said that before Colten was taken to Virginia, he had him every weekend. He said that he is now married to a woman named Amanda. He explained that he is still on probation from his drug conviction; that he is regularly tested for drug use; and that he has not tested positive for the last year and a half. He said that prior to their moving to Virginia, neither the guardians nor Mellisa had restricted his access to Colten because of drug use.

Zeb testified that his concerns about Mellisa getting custody are that she has been there when it was convenient for her, and that he does not think it is right for his son to be placed in her custody with the stepfather and "interracial things." He said that he does not believe that would be right, and that he does not think it would be fair to Colten because of "what he's going to hear growing up and everything he is going to be around."

He stated that his prior drug use involved methamphetamine; that he has smoked marijuana; that he has never used drugs in front of Colten; and that he did not recall ever being under the influence of drugs around Colten. He said that his first rehab was July 31, 1998 through August 28, 1998, and his second was August 21, 2001 through September 12, 2001. He said that the last time he used drugs was before he went to rehab the second time. He stated that he did not recall ever being physically violent toward Mellisa in high school. He said that he brings home approximately $250 a week in his job. With respect to his financial support of Colten, Zeb testified that he "bought him clothes and different stuff when he needed it," and that when Colten started primary school, he gave Tina Tipton $50 or $75 to get Colten some new clothes.

Zeb read his response to an interrogatory in which he explained why he thought it was in Colten's best interest to be with him. Summarizing, he said that the Tipton grandparents were obsessed with Colten; that he had hung in with his son and visited him as much as he could or as much as they would let him; that he knew he had made mistakes in the past, but he had always spent as much time as he could with Colten; that he doesn't agree with the example that Mellisa is setting for Colten; that she has only been there when it was convenient for her; that she has given Colten a black sister by one man and turned around and married another black man; that that doesn't teach Colten anything good about how a family is supposed to be; that Mellisa never really wanted him until now; that he doesn't want his son living in a home with

a black stepfather because it's not right; that he and his family love Colten a lot; that he can provide a more stable home for him; and that it would be impossible to be the father Colten needs when he is 1200 miles away. He denied ever saying anything bad to Colten about Brooke, Colten's half-sister. He stated that he "did not believe in the interracial thing and the mixing"; that "some people accept it, but it's not right"; that they may accept it "up yonder," but "down here it's not really accepted"; that Colten will have problems going through school and everywhere when they go out; and that Colten is going to be the "oddball."

Appellant presented her rebuttal. Sun Bennett testified that she has known both families since sixth and seventh grade and that she witnessed Zeb throw Mellisa against the wall and hold her there one time in junior high or high school. She described how Zeb acts when he is on drugs; she said that she observed that conduct one time at her home in the spring of 2002 when Zeb kept asking her how her husband would feel if he came home and Zeb was taking photos of her naked. She said that she told her husband and then contacted the Tiptons and told them her suspicions that Zeb was on drugs. She said that they then contacted Zeb's parents. Finally, she stated her approval of Colten being raised in a biracial home.

Holly Herrington, Mellisa's sister, testified that she lived in the Tipton home until they moved to Virginia; that she never saw anything that would cause her concern about Mellisa being awarded custody; that she would be concerned about Zeb having custody because about a year ago he had asked her if he could take naked pictures of her and also because of his drug use; that she condoned interracial marriages; and that she had seen her sister use marijuana once or twice.

Karen Dougan testified that she was Billy Tipton's niece and that she had no concerns about Mellisa's ability to care for Colten. She said that she would be concerned about Zeb because one time he came over when she was babysitting Colten and he wanted to take Colten. She said that she could smell alcohol on his breath. She said that she would not let him take Colten and that "he wasn't happy about it." She said that happened about a year ago. She said that she condones interracial marriages and thinks that they are healthy.

Tina Tipton, Mellisa's mother, testified about an incident that occurred about a year and a half earlier where Zeb came to her house to see Colten and "acted really funny." She said that his eyes

were dilated and that he was not the Zeb she was used to. She said that he made her feel very uncomfortable. After he left and she went into the bathroom, she heard a tapping on the bathroom window; it was Zeb, asking to use her phone because his truck was broken. She put on her robe and handed him a phone through the door, but did not let him in; he returned to his truck and it started right up.

Tina stated that she wants Mellisa to have custody of Colten because she thinks Mellisa would be a good mother and nurturer; that Mellisa would raise him to have respect for himself and others; and that Tina and her husband would always be there to help with support. ·She said that she never wanted to take away the fact that Zeb and his family love Colten and that Colten loves them, but that her concern is that when he gets around them, "he turns into a completely different child." She said that he loses his manners and says words that they do not let him say. She said that she also worries about the racial issue. She said that Colten loves his sister and that he should not be taught to think of her in any derogatory way. She described the relationship between Colten and Justin as very good. She also stated that they would facilitate visitation with Zeb and his family. She described the differences in schools in Virginia and how Colten was adjusting. She described the differences between Hope, Arkansas, and Virginia Beach, Virginia, with Virginia Beach being more accepting of interracial marriages and families. She stated that sometimes when Colten returns from visiting his father he says, "My sister has different germs. She's a different color."

Our review of the evidence in this case leaves us with a definite and firm conviction that a mistake was made in finding that it would be in Colten's best interests for Zeb to have custody. A summary of the testimony previously set forth in detail is helpful.

Mellisa has had a loving relationship with Colten. She has worked since high school and provided financial support for him. She has been in the household with Colten for all but approximately eight months, and she has helped with his care. Her child-rearing philosophy is to teach respect for elders, to discourage name-calling, and to respect differences in other persons. Her new husband, Justin, has a good job, a good relationship with Colten, and does not have any type of criminal record. The Virginia Beach locale has a diverse population, where interracial households are not unusual. Colten has a good relationship with his half-sister, Brooke. The maternal grandparents, who had legal

and physical custody for seven years, would live nearby and help with after-school care. Moreover, Mellisa explained that the reason she has not had direct contact with the school is because her parents are listed as the contacts in the school records, but that her parents keep her informed and that they all work with Colten on his school work. We are also very mindful of the fact that Colten and Brooke were both born out of wedlock and that Mellisa has used marijuana on an occasional basis.

Zeb, too, has a loving relationship with Colten and has exercised routine visitation with him. Zeb's parents live nearby in Hope, Arkansas. Zeb has also remarried and has another child. At the time of the hearing, he was still on probation for a drug conviction for possession of methamphetamine. He went to rehab, relapsed, and went to rehab again. He is tested regularly because of his probation status and has had no positive tests in the last one-and-a-half years. He provided no financial support for Colten to speak of, other than occasionally buying clothes and school supplies. His paternity status is not disputed, but nevertheless he did not make formal efforts to legalize his status until Mellisa moved to Virginia. There was testimony that Colten would return from visits with Zeb and engage in name-calling and bad manners. Finally, Zeb readily acknowledges that he does not approve of the interracial household established by Melissa, and that he does not think that it is right for Colten to live there.

In examining this evidence, we hold that the trial court was clearly erroneous in awarding custody of the child to Zeb, and that it would be in his best interests for custody to be placed with Mellisa. It is clear that Mellisa has had more direct involvement in the day-to-day care and financial support of Colten. She is married to a man who has a good relationship with Colten and who has a good job. They live close to her parents, who have served as Colten's guardians his entire life. Moreover, they live in a diverse community, where interracial households are not unusual. Furthermore, Mellisa's child-rearing philosophy promotes racial tolerance, while Zeb's does not. Last, but certainly not least, at the time of the hearing Zeb had been to rehab twice and was still on probation for a drug conviction.

We, therefore, reverse and remand this case to the trial court for an award of custody to Mellisa and the setting of appropriate visitation for Colten to see his father.

Reversed and remanded.

PITTMAN, ROBBINS, NEAL, and CRABTREE, JJ., agree.

GRIFFEN, J., concurs.

WENDELL L. GRIFFEN, Judge, concurring. I join my colleagues in concluding that the trial court erred when it found that granting custody to the father is in the best interest of the child. I further believe that the trial judge erred when he improperly based his child-custody determination on racial bias contrary to the decision of the United States Supreme Court in *Palmore v. Sidoti,* 466 U.S. 429 (1984).

However, I write separately to address ethical and evidentiary aspects of the case that deserve judicial comment. The Supreme Court, in *Palmore, supra,* held that the Equal Protection Clause of the Fourteenth Amendment prohibits consideration of private racial bias in determining the best interest of a child in a custody case. Yet, in this case no objections were raised, and the trial judge did nothing, despite persistent questions from appellee's counsel regarding appellant's interracial family and despite the specious argument that Colten would likely experience problems from growing up in an interracial family.

Given the *Palmore* holding, the compelling question arises as to the extent that trial counsel are or should be allowed to examine witnesses regarding the existence of a private racial bias. In other words, does *Palmore* prohibit trial counsel from questioning witnesses regarding racial bias, and does *Palmore* allow or require a trial court, *sua sponte,* to preclude or limit this line of questioning, where no objection is raised? Because *Palmore* clearly prohibits the use of racial bias as a basis for a custody decision, this is not merely a matter of a trial court acting in a politically correct manner in hearing evidence and reaching a judicial determination. Rather, this is a matter of courts enforcing rights granted by the federal constitution and of preventing court proceedings from being converted into forums where bigotry is promoted and tolerated under the guise of trial advocacy.

The situation seems analogous to one in which testimony that is not admissible to prove a person's character may be admissible for other purposes, such as to prove motive, opportunity, or intent. Ark. R. Evid. 404(b). In other words, character evidence is only admissible for the purposes stated under Rule 404(b). Our courts have specifically held that such evidence is admissible to prove bias. *Jones. v. State,* 349 Ark. 331, 78 S.W.3d

104 (2002). The rationale under Rule 404(b) should apply here. While it seems relevant for a trial court making a custody determination to understand one parent's basis for objecting to the other parent receiving custody, such evidence admitted for any other purpose would seem to run afoul of *Palmore*. It would be appropriate to permit cross-examination to expose that a witness is motivated by racial bias for purposes of discrediting witness testimony consistent with *Palmore* and Rule 404(b). However, that is a far cry from eliciting direct testimony from a string of witnesses in support of a racial bias deemed impermissible by the *Palmore* holding.

The conduct of trial counsel for appellee in this regard is striking, to say the least. Time constraints during oral argument before this court prevented thorough inquiry about that conduct. However, there is no reason for cursory treatment of the conduct in an appellate opinion where the conduct caused the trial court to commit reversible error in violation of the Equal Protection Clause of the Fourteenth Amendment. Counsel for appellee was not content to merely elicit testimony from his client showing his client's objection to his son being reared in an interracial home. Counsel persisted with this line of examination with every witness.

During the February 5, 2003 custody hearing, counsel asked Billy Tipton, appellant's father, about his son-in-law's racial identity. He asked appellant whether her husband "is interracial," established that her son is not interracial and that her three-year-old daughter is interracial, and asked appellant if she had "any reservations raising a non-interracial child in an interracial marriage." Counsel also asked appellant if she would encourage her son "to participate in interracial relationships" and mentioned that appellant had "gotten married to this black man."

During direct examination of Janice Quillen, counsel for appellee mentioned that appellant has "an interracial marriage" and asked Quillen "[d]oes that cause you concern that the child will be placed in that type of environment with the mother?" During direct examination of Lynn Kimbell, a Springhill High School secretary, counsel asked whether "the possibility of placing the child in an inter or bi-racial marriage to be raised in Virginia" would cause the witness "any concern." During direct examination of Judy Kay Kidd, counsel asked the witness, "[w]ould placing the child in that environment (a bi-racial home with the mother) concern you?" During direct examination of Alicia Aaron Reed,

counsel asked if the witness was concerned that the trial court "has been asked to place this child in a bi-racial home."

When counsel for appellee cross-examined Sun Bennett, he asked whether she could "see any detriment to a child who is not biracial to be raised in a biracial home" and whether she encouraged "that lifestyle." One of the questions put to Holly Herington during cross-examination was "Do you see any difficulties in raising a child that is not interracial in an interracial home?" Cross-examination of Karen Dougan, appellant's cousin, included the following questions: "You would condone interracial marriages?" "You think they're healthy?" "You know of any detriment that could cause a child that is not interracial to be raised in a home like that?" And when counsel for appellee cross-examined Tina Upton, appellant's mother and the woman who practically raised Colten from birth, his inquiries included the following questions: "I assume you condone interracial marriages?" "I assume you condone raising a non-racial child in an interracial home?" "You disagree with all these people from Springhill [appellee's witnesses] that's testified today when each one said they don't agree with you?"

At no time before or after this line of questioning did counsel for appellee produce the slightest proof that Colten was subjected to any harm or risk of harm because his mother is married to a black man, because his sister is biracial, or from growing up in an interracial home. Nevertheless, counsel for appellee made the following remarks as part of his closing argument to the trial court:

> There's an issue here about whether a person approves or doesn't approve of interracial marriages or the raising, but it's not the approval or disapproval of interracial marriages. They're [appellant] asking to put a child who is not interracial in a situation to be raised by an interracial husband and wife and that creates a whole different scenario than an interracial child being raised in an interracial home. They want to talk about he needs to love his little interracial sister. Well, he's got another half sister that's not interracial. We feel that child would be safer here in Hempstead County, Arkansas. . . .

For its part, the trial court did nothing to suggest displeasure with the tactics of counsel for appellee. The only question it put to counsel for the parties at the close of the case was: "To counsel, are you aware of any law or cases dealing with, in Arkansas specifically,

a child not of an interracial marriage being placed into an interracial marriage?'' Even if the trial court did not condone counsel's improper conduct, its ruling appears to have given it judicial approval. During its bench ruling, the trial court remarked as follows:

> As far as the home, the fact that it is biracial in Mellisa's [appellant's] case should not have any bearing whatsoever on the fact that Colten has been around there and has had a good home there. *I do believe that it will create problems for him in the future.*''

(Emphasis added.)

Aside from the unsubstantiated lay-opinion testimony of appellee and his witnesses (none of which was adduced upon an evidentiary foundation that Colten experienced problems, suffered any harm, or demonstrated any risk of being harmed while growing up in an interracial household), the trial court's assertion during its bench ruling that growing up in an interracial household would create problems for Colten was entirely without evidentiary basis. As the majority opinion holds, the trial court's reliance in rendering its decision on what amounted to animosity toward appellant's interracial marriage and household directly violated the holding in *Palmore, supra*. Again, the trial court's error was not merely by allowing this testimony, for it plainly demonstrated the biases of the witnesses. Ark. R. Evid. 404(b). The error lay in basing the custody decision on such bias.

Jurors, as fact-finders, are not to be swayed by prejudice. This is reflected in the fact that trial counsel are not allowed to make opening or closing comments that appeal to the jury's passion or prejudice. *Newman v. State*, 353 Ark. 258, 106 S.W.3d 438 (2003). Further, a factfinder may not consider evidence that serves no apparent purpose and that is used only to inflame a jury's passion. *Upton v. State*, 343 Ark 543, 36 S.W.3d 740 (2001). Here, the apparent purpose of eliciting testimony from witnesses other than appellee, who testified regarding racial bias, was to persuade the trial court based upon sheer prejudice. As such, that additional testimony was not only unhelpful in reaching a correct legal result regarding custody in light of *Palmore*; additional testimony to buttress the prejudiced views of appellee was also cumulative and redundant.

The question thus becomes, in a non-jury case, should a trial court be allowed to hear and rely upon evidence that is based upon prejudice, even where no objection to the admission of that

evidence is raised? The United States Supreme Court in *Palmore* stated that, while private biases may be outside of the reach of the law, the law cannot, directly or indirectly, give them effect. *Palmore, supra,* at 483. For trial counsel to elicit answers to questions concerning racial biases that are constitutionally prohibited and for the trial court to allow such questioning seems, at the least, to indirectly give these biases effect. However, even if *Palmore, supra,* does not require such self-restraint, it would seem that judges and attorneys, as officers of the court, should impose such restraints upon themselves out of respect for the ethical principles upon which our expectations of justice are based.

Canon 3(B)(2) the Arkansas Code of Judicial Conduct requires a judge to be faithful to the law and to maintain professional competence in the law. Canon 3(e) requires a judge to perform judicial duties without bias or prejudice. Canon 3(c) also prohibits a judge, in the performance of judicial duties, from manifesting bias or prejudice, by words or conduct. That Canon also expressly states that a judge shall not permit court officials or others subject to the judge's direction to manifest bias or prejudice. Surely, if federal law prohibits consideration of private biases in making custody determinations, a trial court is empowered, if not required, to raise the issue on its own — otherwise, how can a judge fulfill his or her duty under the judicial canons to be "faithful to the law" and to avoid the manifestation of bias or prejudice?

Finally, Rule 3.4(e) of the Model Rules of Professional Conduct prohibits attorneys from alluding to any matter that will not be supported by admissible evidence. If trial counsel are prohibited from appealing to the factfinder's sense of passion or prejudice in opening and closing remarks, which are not evidence, how much more so should trial counsel refrain from eliciting actual evidence that is constitutionally prohibited? Counsel for appellee may have been obliged to elicit testimony from appellee to show why his client objected to appellant being granted custody. Yet, I see no reason for eliciting such testimony from each of the other witnesses other than to appeal to what counsel or his client hoped would be a similarly prejudiced attitude in the trial judge. Doing so was not only in direct violation of the holding in *Palmore*; such conduct arguably was unethical under Rule 3:4.

While *Palmore, supra,* admittedly provides very little guidance on this issue, it is nonetheless incumbent upon our judges and attorneys, as sworn officers of the court, to conduct trials in a manner that is consistent with our laws and rules of professional

conduct. For trial counsel to deliberately and repeatedly elicit testimony regarding racial bias in contravention of federal law, and for the trial court to allow such testimony to be elicited and to rely upon that testimony in reaching its decision, seems to run counter to both *Palmore, supra,* and to our rules of professional conduct.

It is not asking too much of lawyers and judges to confront racial bias during court proceedings. To the contrary, one would ordinarily consider a court proceeding to be the most likely secular forum where racial bias would be immediately and firmly met with vigorous objections from legal counsel and a stern rebuke from judges sworn to uphold equal protection of the law. It seems ironic that, as we celebrate the fifty-year anniversary of *Brown v. Board of Education,* 347 U.S. 482 (1954), appellee's counsel in the instant case elicited, without limitation or objection, testimony regarding racial bias that would have compelled reversal if a proper objection had been raised. Sadly, this demonstrates that fifty years after *Brown,* and twenty years after *Palmore,* in the judicial context, we have not come as far regarding interracial understanding as some observers would believe or hope.

I am authorized to state that Judges Neal and Crabtree join in this opinion.