# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-13-56

| | | |
|---|---|---|
| EMILY DODD (RAFF)<br><br>APPELLANT<br><br>V.<br><br>CALEB GORE<br><br>APPELLEE | | **Opinion Delivered** October 2, 2013<br><br>APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. DR 2009-684-4]<br><br>HONORABLE JOHN R. SCOTT, JUDGE<br><br>REVERSED |

## RITA W. GRUBER, Judge

This case involves a custody dispute between Emily Dodd Raff and Caleb Gore over their son P.D.G., who was born on August 18, 2008. Initial custody was established in an order entered on September 26, 2009, after Caleb filed a petition for paternity seeking visitation rights. In that order, the trial court found that Caleb was P.D.G.'s biological father, directed that the child's surname be changed from Dodd to Dodd-Gore, vested primary custody with Emily, and gave Caleb what was, essentially, standard visitation. Emily brings this appeal from the trial court's order entered on September 24, 2012, in which the court modified its initial custody order, changing primary custody to Caleb and awarding visitation to Emily. Emily argues that the trial court erred in finding that there was a material change of circumstances to support the modification and in finding that modification was in her son's best interest. Because we agree that the record does not support the court's material-change-

of-circumstances finding, we do not address its best-interest finding and we reverse the court's order.

Testimony at the hearing on Caleb's petition for modification indicated that the parties did not always communicate well regarding P.D.G.'s care. Caleb testified that, after the initial custody order, he had married Krystal Gore on March 19, 2011. He testified that he attended school and worked full-time at Tyson Foods as an operation associate. He filed his petition in part in response to a Facebook message he received from Emily's then fiancé, Gene Raff, telling Caleb that Gene was planning to marry Emily and move with Emily and P.D.G. to Florida. At that point, Emily had not informed him that she was taking P.D.G. out of state other than to see her mom in Houston.

Caleb said that he and Emily communicated mainly through texts and that his primary means of communication with her had been with Gene after the two were married on July 10, 2011. Caleb also testified that he rarely saw Emily because she had not given him the code to get through the gates to her apartment and that he or Krystal and Gene exchanged P.D.G. for visitation outside the gate. Despite his request, Emily did not provide the code, and visitation exchange continued outside the gate for more than a year. Emily invited Caleb to her apartment and gave him the code a week before the hearing.

Caleb's petition and testimony at trial also described the following matters of concern. Emily took the child out of state for several days, left him unattended for several minutes in her car at a gas station, frequently asked Caleb to pick the child up at her parents' house, and communicated with Caleb about the child through Gene. Caleb's principal concern appeared

2

to be Emily's apparent lack of attention to P.D.G.'s medical care and insurance. Initially, P.D.G. was covered by ARKids First health insurance and the parties were obligated to split any medical expenses not covered by insurance.[1] At some point that remains unclear, P.D.G. was no longer covered by ARKids and was covered by TRICARE through Gene's work, but Emily's testimony was confusing regarding exact dates of coverage. Caleb testified, and Emily did not dispute, that she had not taken P.D.G. to regular wellness checkups. Caleb also said that, when he learned in June 2012 that P.D.G. was not covered by insurance, he told Emily that he had insurance through his work and needed P.D.G.'s social security card in order to secure coverage for him. Emily told Caleb that she did not have time to discuss the matter, and she did not discuss it again with him until the week before the hearing in September 2012, when she told him that she had a doctor's appointment scheduled for P.D.G. and needed to have him covered under Caleb's insurance policy.

Both parties testified that, in February 2012, P.D.G. became very ill and Emily took him to Gene's stepfather, who was an allergist, who recommended treating him with over-the-counter medicine. When Caleb picked up P.D.G. the next day, he discovered that he was very sick and made an appointment at the Lowell Medical Clinic, where they had taken P.D.G. when he was younger. The clinic informed Caleb that P.D.G. was not covered by insurance, so Caleb paid for the visit. P.D.G. was diagnosed with RSV and given antibiotics with instructions to treat P.D.G.'s fever with Tylenol and Advil, alternating every four hours. He and Krystal set alarms in order to make sure they were awake to give P.D.G. the proper

---

[1]The court did not order either party to provide health insurance for P.D.G.

doses. Caleb returned P.D.G. to Emily the next day. While with Emily, P.D.G.'s fever rose to 105 degrees, and Emily took him to the hospital. Emily admitted that she had forgotten to wake P.D.G. to give him Tylenol. After Caleb retrieved P.D.G. for visitation several days later, he texted Emily to ask about P.D.G.'s antibiotic. She responded that it was in P.D.G.'s coat pocket. Caleb expressed concern that Emily had neglected to tell him that she had put antibiotics in her three-year-old's coat pocket.

Finally, the parties testified about their difficulties placing P.D.G. in a preschool program. The parties apparently discussed sending P.D.G. to preschool in September 2011, determined that it would be good for him, and agreed upon it, but—with no explanation to Caleb—Emily later changed her mind and refused to send him. Then, in April of 2012, one month after Caleb filed his petition for modification, Emily enrolled P.D.G. in a preschool program for the fall of 2012. She did not inform Caleb until August, several days before the program began.

Emily's testimony was not particularly helpful. She had very little explanation for why she made certain choices—such as having visitation exchanges outside her apartment gates rather than at her apartment, failing to take P.D.G. to regular wellness checkups, failing to make it a priority to ensure P.D.G. was covered by valid insurance, and failing to inform Caleb that she had enrolled their son in preschool until several days before it began. She did testify that the deposition "was sort of an eye opening event for me that I realized that maybe there were some things that I was really screwing up."

The court entered an order on September 24, 2012, finding that a material change in

4

circumstances had occurred since the paternity order was entered vesting custody with Emily and that it was in P.D.G.'s best interest to change primary custody to Caleb. In its order, the court found that Emily's testimony regarding P.D.G.'s health-insurance coverage was contradictory and confusing. The court also found it perplexing that Emily failed to tell Caleb that she had registered their child for preschool until immediately before he began. Further, the court noted in its order that Emily's frequent response to questioning was "I don't know" and that she held a toy in her hand during her testimony for "luck and courage." Finally, the court specifically found that Emily's actions and inactions "did not result in permanent harm to the parties' minor child, but the potential existed and exists today." Emily filed this appeal from the court's order.

We review child-custody cases de novo, but we will not reverse a circuit court's findings unless they are clearly erroneous. *Taylor v. Taylor*, 353 Ark. 69, 77, 110 S.W.3d 731, 735 (2003). Because the question of whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest. *Sharp v. Keeler*, 99 Ark. App. 42, 44, 256 S.W.3d 528, 529 (2007). There are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry as great a weight as those involving minor children. *Vander Heyden v. Vander Heyden*, 2012 Ark. App. 356, at 3.

The primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Grove v. Grove*, 2011 Ark. App. 648, at 6,

5

386 S.W.3d 603, 607. In order to make changes to custody or visitation, the party seeking modification must first demonstrate that a material change in circumstances affecting the best interest of the child has occurred. *Byrd v. Vanderpool*, 104 Ark. App. 239, 242, 290 S.W.3d 610, 612 (2009).

While our review of the evidence suggests that Emily has not made the best choices regarding her son and has often demonstrated an immaturity and lack of diligence in regard to caring for him, we hold that Caleb has not, at this point, carried his burden to show that a material change in circumstances has occurred since the initial custody order. *See, e.g.*, *Byrd*, 104 Ark. App. at 244, 290 S.W.3d at 613 (holding that a "scattering of petty complaints" did not amount to changed circumstances justifying the court's modification of custody). Courts impose more stringent standards for modifications in custody than they do for initial determinations of custody in order to promote stability and continuity in the life of the child, and to discourage the repeated litigation of the same issues. *Hatfield v. Miller*, 2009 Ark. App. 832, at 7, 373 S.W.3d 366, 371. Given those more stringent standards, we conclude that, as a matter of law, the facts in this case do not amount to a material change in circumstances warranting a change of custody. Therefore, we reverse the trial court's order changing primary custody to Caleb.

Reversed.

HIXSON and WOOD, JJ., agree.

*Wright, Lindsey & Jennings LLP*, by: *Troy A. Price*, for appellant.

*Clark & Spence*, by: *George R. Spence*, for appellee.