Cite as 2015 Ark. App. 197

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-14-776

|  |  |
|---|---|
| LADONNA S. GEREN WILLIAMS<br>APPELLANT<br><br>V.<br><br>PATRICK B. GEREN<br>APPELLEE | **Opinion Delivered** March 18, 2015<br><br>APPEAL FROM THE SEBASTIAN<br>COUNTY CIRCUIT COURT, FORT<br>SMITH DISTRICT<br>[No. DR-2008-303]<br><br>HONORABLE ANNIE POWELL<br>HENDRICKS, JUDGE<br><br>REVERSED |

**LARRY D. VAUGHT, Judge**

Appellant LaDonna Geren Williams (LaDonna) appeals the Sebastian County Circuit Court's order modifying custody of her two minor children, E.G.1 and E.G.2. The court removed the two girls from LaDonna's custody and placed them in the custody of their father, appellee Patrick Geren (Patrick). LaDonna argues that the circuit court erred in finding changed circumstances and erred in determining that a transfer of custody was in the children's best interest. We agree that there was no material change in circumstances sufficient to warrant modification of custody and therefore reverse. We do not reach LaDonna's second point as to best interest.

LaDonna and Patrick were married on February 16, 1997. They divorced on May 9, 2008. There were three children born of the marriage: a son, Tyler, who is now an adult, and two daughters, E.G.1, born in 2003, and E.G.2, born in 2005. The divorce decree awarded custody of all three children to LaDonna. The divorce decree anticipated that both parents would spend

equal amounts of time with the children and ordered that Patrick pay all daycare expenses in lieu of child support. In January 2013, Patrick married Sue Geren. Sue and her two minor sons began living with Patrick. In August 2013, LaDonna transferred the girls from the Greenwood School District to the Fort Smith School District, in which she was residing. In 2013, LaDonna filed a motion to set child support, alleging that the children were not spending equal time with each parent and that Patrick was not paying daycare expenses. Patrick filed a response and motion for modification of custody alleging the following material changes in circumstances: (1) LaDonna had driven with the minor children in her car after drinking, (2) LaDonna had picked up the children from visitation while intoxicated by alcohol, (3) LaDonna had left the minor children home alone for extended periods of time while she went out drinking, (4) LaDonna was cohabiting with a man to whom she was not married, and (5) there were other factors that impacted the welfare of the children that would "be shown at a hearing of this matter." LaDonna filed a response denying the allegations. In December 2013, LaDonna married Tony Williams, the man with whom Patrick alleged she had been cohabiting.

A hearing was held on May 14, 2014. E.G.1, age ten, testified that she lived with her mother, sister, and stepfather, Tony Williams, and visited her dad. She testified that she was going to a new school but preferred her old school and that she was an A and B student but had recently gotten two C grades. E.G.1 testified that during visitation at her father's house she was allowed to call her mother, that the younger children were sometimes left in the care of Sue's fourteen-year-old son, and that she got along with both of her stepbrothers. She also testified that she and her sister were sometimes left alone at her mother's house. E.G.1 testified that her

father's wife, Sue Geren, did not drink alcohol, but that her mother's husband, Tony Williams, drank beer at the house. E.G.2, age eight, testified that she liked being at both her mother's and father's houses, was happy living with her mother, liked her stepfather, was doing well in school, had friends, and maintained good grades.

LaDonna testified that Patrick had not paid child-care expenses as ordered in the divorce decree. She testified that the children had spent approximately equal amounts of time with both parents until recently and that she was asking for child support because she was caring for the children more than originally anticipated. LaDonna testified that the girls attended an after-school care program called Girls, Inc., which provided activities that they enjoyed. She testified that Patrick refused to help pay for Girls, Inc. She introduced a letter from Patrick in which he refused to pay for $5 school t-shirts for the girls, and she testified that the letter was actually written by Sue.

LaDonna described an acrimonious relationship between herself and Sue. She stated that she could not communicate with Patrick because Sue was the "gatekeeper," that Sue had soured her co-parenting relationship with Patrick, and that Sue had called her a "fucking bitch" in the children's presence.

LaDonna testified that, while under Patrick's care, E.G.2 had fallen into his swimming pool and nearly drowned. LaDonna, a former nurse, testified that Patrick had not been truthful about the extent of E.G.2's injuries and the seriousness of her condition when he initially called her and that he had not immediately sought emergency medical care. LaDonna testified that E.G.1 had special medical needs due to kidney problems and required vigilant monitoring and

care. LaDonna testified that she and both girls had a latent type of antibiotic-resistant staph infection known as MRSA, which can cause severe complications. She testified that, as a trained nurse, she knew how to care for the girls' health needs, including preventing and detecting MRSA outbreaks.

LaDonna stated that she had recently married Tony Williams, whom she had dated for five years before the marriage. She denied that, prior to their marriage, Tony had lived with her or stayed overnight with her while the children were present. She described Williams's relationship with her children as very good. She stated that he sometimes took care of the girls when she was at work.

LaDonna testified that she worked two full-time jobs: the resident manager at the apartment complex where she lived and a cereal packaging operator with Nestle. She stated that, as manager of the apartment complex, she was provided a large apartment directly above (and connected to) the office. She testified that she had to be available from 9:00 a.m. to 6:00 p.m., but she did not have to be in the office the entire time and she had assistants who could help if needed. LaDonna's duties as residential manager sometimes required her to leave the girls in the apartment while she was downstairs in the office or somewhere else in the complex. She testified that she left the girls with the office phone in case they needed anything and also had her assistants watch them. LaDonna's second job at the Nestle plant was a swing-shift position, meaning that she worked every other weekend and two variable days per week. Those shifts were night shifts, starting at 6:00 p.m. and ending at 6:30 a.m., during which the girls were usually either at Patrick's house for scheduled visitation or in the care of LaDonna's husband.

She testified that, when she got off work at 6:30 a.m., she would then get the girls ready for school and take them to school before coming home and sleeping from approximately 9:30 a.m. to 3:00 p.m. The girls would usually be at school while she slept, or Tony, her assistants, and other family members would help care for them.

LaDonna testified that she drank alcohol approximately once or twice per week, but not to the point of intoxication. She estimated that she normally had two to four bottles of beer over a period of three or four hours. She stated that she drank when the girls were not present. She testified that Tony had a couple of beers approximately three to four times per week. Tony was convicted of DWI two years prior to the custody hearing.

LaDonna testified that Patrick had picked the girls up several times while smelling of alcohol. However, she stated that this did not worry her because she knew he was still able to drive and that if he had been intoxicated she wouldn't have allowed the girls to go with him. LaDonna testified that she had driven the children after drinking alcohol on approximately three occasions but denied that she had been intoxicated. She denied picking up the children from Patrick after drinking, but then admitted that she might have had "a beer or two."

LaDonna's mother, Jackie Copeland, testified that she had observed Patrick pick up the children for visitation while smelling of alcohol. She stated that Patrick had given her money for clothes for the children on more than one occasion.

Tony Williams testified that he was married to LaDonna, that he had a separate residence at the apartment complex and a house in Pocola, and that he had a good relationship with LaDonna's daughters. He testified that LaDonna's work schedule, working two jobs, gave him

an opportunity to spend extra time with the girls. He stated that he wanted the girls to remain in their home.

Patrick presented several witnesses who were acquaintances of his and LaDonna's. Latricia Miller testified that she saw LaDonna out at bars approximately every six weeks. She stated that, on these occasions, she thought they were all "drinking for an extended period of time." She never saw LaDonna drink anything other than beer. Miller testified that she had seen LaDonna at a bar the previous weekend, at a poker event, and that it was her understanding from Patrick and Sue that LaDonna was supposed to have the girls that weekend. She had seen LaDonna three or four weeks before the hearing at a pool tournament where Miller stated that LaDonna was drinking but wasn't intoxicated.

Mary Williamson testified that Patrick was a caring and attentive father who placed the girls' needs before his own and Sue was the same way. She stated that Sue used profanity and it would not surprise her if Sue had called LaDonna a "fucking bitch," although she testified that it was not like Sue to use that language in front of the children.

James Womack testified that Patrick was a very involved father. Womack stated that he had never seen Sue act mean or inappropriate to the girls and that he had observed the girls crying on multiple occasions because they did not want to go home to their mother.

Patrick's wife, Sue Geren, testified that Patrick was a devoted and loving father, she loved the girls as if they were her own, and she had a good relationship with the girls. Sue testified that, when they first started dating, approximately five years before the hearing, Patrick kept the girls more than LaDonna, approximately three to five nights per week. That changed, according to

Sue, when LaDonna transferred the girls to a different school district the previous August. Sue testified that she had never observed Patrick drink alcohol on the way to or from picking up the girls. She stated that Patrick had an alcohol problem four years before the hearing, but that he had gotten help and no longer had a drinking problem. She said that Patrick rarely drank, having maybe two to three drinks occasionally on Friday or Saturday nights. Sue stated that she had smelled alcohol on LaDonna and had seen her staggering during visitation exchanges.

Sue testified that, in 2009, LaDonna punched her in the back of the head. She denied calling LaDonna a "fucking bitch." Sue testified that LaDonna had insulted her in front of the girls by making a derogatory comment that Sue needed to wear a bra.

Sue testified that she and Patrick occasionally left the girls and her younger son in the care of her fourteen-year-old son. Sue explained that, when the girls had attended Greenwood schools, they could catch the school bus just down the street from Patrick's house and ride to school with her sons. They could then ride the bus home again. Patrick's work schedule allowed him to be home before the bus arrived every day, and Sue arrived shortly after. Sue testified that their evenings involved dinner together and homework, with which Patrick helped. She testified that, when in LaDonna's care, the girls were usually at Girls, Inc., from the time they got out of school at approximately 3:15 p.m. until about 7:00 p.m. She stated that Patrick had paid his half of the costs for Girls, Inc.

Patrick's mother, Beverly Geren, testified that she and Patrick's father occasionally took care of the girls. She testified that the girls were afraid to switch schools. She testified that, before the girls switched schools, they spent nearly every day at Patrick's house and that he had

them during the summers. Beverly testified that LaDonna did not seem interested in the girls like a mother should be. She said that, before August, Patrick was the primary caregiver. She described Patrick as a close, caring father. She described Sue as caring and loving and stated that Sue treated the girls as if they were her own. She stated that, since the girls started living at LaDonna's most of the time, she had observed a change in their demeanor. They would get upset when it was time to go back to their mother's house. She testified that Sue and Patrick took the girls to church, Sunday school, and church camp. She observed Patrick buying clothes and shoes for the girls more than once. She stated that two of her sons, one of whom was Patrick, had experienced problems with alcohol. She testified that Patrick had two DWI convictions.

Patrick testified that he worked from 7:00 a.m. until 3:30 p.m. at Exide Technologies and was also in the Army National Guard. He stated that, prior to August, the girls had lived with him a majority of the time. He testified that, instead of spending time with the girls, LaDonna would sometimes ask him to take them to her parents' house or ask him to keep them overnight. He said the girls sometimes spent five or six days in a row at his house between visits to see LaDonna and on at least one occasion they stayed with him for nine days without seeing her. He stated that this was the pattern of their custody arrangement from the time of the divorce until the previous August, when LaDonna informed him that she was transferring the girls from the Greenwood School District to the Fort Smith School District. He objected to the transfer. Patrick testified that the school transfer made it impossible for him to keep them on week nights because he could not drive them to their new school and still make it to work on time. Patrick

stated that he would change the children's school back to Greenwood if he was awarded custody.

Patrick denied ever picking the girls up while drunk but admitted that a few years ago he may have driven to pick them up after drinking a few beers. He described the treatment he had received for problems related to alcohol and testified that he was released from care almost two years prior to the hearing. Patrick testified that he did not drink on weekdays because he sometimes had to go to work very early. He said that he sometimes drank two or three beers on Friday or Saturday night after the kids had gone to bed. He testified that he hadn't driven under the influence of alcohol since his last DWI. He testified that his anxiety and mental-health issues had greatly improved since coming home from Iraq. He stated that he had never smelled alcohol on LaDonna when she picked up the girls but explained that she never got out of the car and usually just honked for them to come out.

Patrick disputed LaDonna's account of E.G.2's near-drowning incident. He stated that he was mowing the grass near his pool and took his eyes off of her for less than thirty seconds. He stated that he immediately performed CPR and drove E.G.2 to get help. He stated that he had truthfully conveyed the situation to LaDonna.

After the hearing, the court entered an order transferring custody to Patrick. LaDonna filed a timely notice of appeal.

In reviewing child-custody cases, we consider the evidence de novo but will not reverse a trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Lowder v. Gregory*, 2014 Ark. App. 704, at 14, 451 S.W.3d 220, 229. We give due

SLIP OPINION

deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Id.* This deference is even greater in cases involving child custody, as a heavier burden is placed on the trial judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.* Where the circuit court fails to make findings of fact about a change in circumstances, this court, under its de novo review, may nonetheless conclude that there was sufficient evidence from which the circuit court could have found a change in circumstances. *Campbell v. Campbell*, 336 Ark. 379, 384, 985 S.W.2d 724, 727 (1999); *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988).

LaDonna first argues that there was insufficient evidence to find a material change in circumstances warranting modification of custody. Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Harris v. Harris*, 2010 Ark. App. 160, 379 S.W.3d 8. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody in order to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. *Grisham v. Grisham*, 2009 Ark. App. 260. The party seeking modification of the custody order has the burden of showing a material change in circumstances. *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005). In order to change custody, the trial court must first determine that a material change in circumstances has occurred since the last order of custody; if that threshold requirement is met, it must then determine who should have custody, with the sole consideration being the best interest of the children. *Tipton v. Aaron*, 87 Ark. App. 1, 6, 185 S.W.3d 142, 145 (2004). Determining whether there has been

SLIP OPINION

a change of circumstances requires a full consideration of the circumstances that existed when the last custody order was entered in comparison to the circumstances at the time the change of custody is considered. *Carver v. May*, 81 Ark. App. 292, 101 S.W.3d 256 (2003). The trial court's findings on whether a material change in circumstances warrants a change in child custody will not be reversed on appeal unless they are clearly erroneous. *Shannon v. McJunkins*, 2010 Ark. App. 440, 376 S.W.3d 489.

In its order, dated May 20, 2014, the circuit court found the following material changes in circumstances:

(1) the aggressive behavior, testimony, and demeanor of [LaDonna] toward [Patrick], [Sue], and in general;

(2) the testimony regarding [LaDonna's] abuse and use of alcohol, while [LaDonna] repeatedly accused [Patrick] of abusing and using alcohol; and

(3) the testimony and demeanor of [LaDonna's] current husband and the sincere and credible testimony of [Patrick] and his current wife.

We will analyze each of these findings separately.

### I. The Aggressive Behavior, Testimony, and Demeanor of [LaDonna] Toward [Patrick], [Sue], and in General

LaDonna testified that she and Sue did not get along, that she preferred not to communicate with Sue, and that Sue was the "gatekeeper" for Patrick. LaDonna described her relationship with Sue as acrimonious. Sue testified that LaDonna hit her in the back of the head, argued with her, made a derogatory comment about Sue's need to wear a bra, and refused to communicate with her. From the language of the order, it appears that the court was also considering LaDonna's demeanor at trial and her allegations against Patrick and Sue.

First, we must consider whether LaDonna's "aggressive behavior, testimony, and demeanor" constituted a change since the previous custody order was entered. We have previously held that, in order to avoid the relitigation of factual issues already decided, the courts will restrict evidence on a custodial change to facts arising since the issuance of the prior custody order. *Myers v. McCall*, 2009 Ark. App. 541, at 5, 334 S.W.3d 878, 881. "For a trial court to change the custody of children, it must first determine that a material change in circumstances has transpired *from the time of the divorce decree* and, then, determine that a change in custody is in the best interest of the child." *Lewellyn v. Lewellyn*, 351 Ark. 346, 355, 93 S.W.3d 681, 686 (2002) (emphasis added). The requirement that limits the circuit court's review to changes that have occurred since the last custody order contemplates that the circuit court was aware of the relevant circumstances at the time the previous custody order was entered. As a result, a change of circumstances can also be found where the facts existed at the time of the previous order, but were unknown to the trial court. *Myers*, 2009 Ark. App. 541, at 5, 334 S.W.3d at 881.

The previous custody order in this case was the 2008 divorce decree granting LaDonna custody. While there was no direct finding as to whether LaDonna's behavior, testimony, and demeanor was more aggressive at the time of the 2014 custody hearing than it had been when the court entered the 2008 divorce decree, the evidence supports such a conclusion. It was undisputed that the acrimony between the parties stemmed from LaDonna's relationship with Sue. Since Patrick's relationship with and ultimate marriage to Sue occurred after the divorce decree, the resultant animosity that developed between LaDonna and Sue can also be reasonably assumed to have developed after the divorce decree.

12

SLIP OPINION

Next, we must consider whether the circuit court's conclusion that LaDonna displayed aggressive behavior and demeanor is enough to constitute a material change in circumstances. In *Word v. Remick*, 75 Ark. App. 390, 393, 58 S.W.3d 422, 424 (2001), we described the standard as "proof that the conditions have so materially changed as to warrant modification." "Petty complaints and parental gamesmanship may not rise to the level of a material change in circumstances, especially if the child is left relatively unscathed." *Hart v. Hart*, 2013 Ark. App. 714, at 3 (citing *Dodd v. Gore*, 2013 Ark. App. 547; *Byrd v. Vanderpool*, 104 Ark. App. 239, 244, 290 S.W.3d 610, 613 (2009)). Moreover, a custodial parent's change in attitude is not necessarily sufficient to constitute a material change. For example, in *Stellpflug v. Stellpflug*, we reversed the circuit court's modification of visitation because "the only change that occurred in this case was appellee's attitude regarding summer visitation." 70 Ark. App. 88, 93, 14 S.W.3d 536, 539 (2000). Here, the only change that occurred was LaDonna's attitude regarding Sue. Finally, we note that modification of custody is an extreme remedy for such a minor change. We have previously said that, even where a custodial parent willfully violates court orders, modification is not necessarily warranted because a court's contempt powers should be used prior to the more drastic measure of changing custody. *Carver v. May*, 81 Ark. App. 292, 297, 101 S.W.3d 256, 260 (2003); *Carter v. Carter*, 19 Ark. App. 242, 719 S.W.2d 704 (1986).

Patrick urges us to find that LaDonna's aggressive behavior and demeanor constitutes a material change because it can be likened to the type of behavior addressed in Arkansas Code Annotated section 9-13-101(b)(1)(a)(iii), which states that "[i]f, at any time, the circuit court finds by a preponderance of the evidence that one (1) parent demonstrates a pattern of willfully

13

creating conflict in an attempt to disrupt a current or pending joint-custody arrangement, the circuit court may deem such behavior as a material change of circumstances . . . ." However, section 9-13-101(b)(1)(a)(iii) clearly does not apply here because LaDonna and Patrick did not share joint custody.

We cannot agree with the circuit court's finding that LaDonna's "aggressive behavior, testimony, and demeanor" rose to the level of a material change. Even if taken as true, the allegations regarding LaDonna's aggressiveness were immaterial. The testimony showed that LaDonna and Sue did not get along, did not communicate, and sometimes argued. These facts did not, on their own, constitute a material change in circumstances sufficient to warrant modification.[1]

### II. The Testimony Regarding [LaDonna's] Abuse and Use of Alcohol, While [LaDonna] Repeatedly Accused [Patrick] of Abusing and Using Alcohol

The evidence supporting a finding that LaDonna abused alcohol included LaDonna's own admission that she may have driven the children after drinking a beer or two, Sue's testimony that she had observed LaDonna pick up the girls while smelling of alcohol and had seen LaDonna stagger while apparently drunk, and Latricia Miller's testimony that she had seen LaDonna drinking at bars approximately every six weeks.

As discussed above, we must first address whether there was any change in LaDonna's use of alcohol since the previous divorce decree. *Lewellyn*, 351 Ark. at 355, 93 S.W.3d at 686.

---

[1]We have previously held that certain factors, when examined in the aggregate, may support a custody modification even where each factor, if examined in isolation, would not. *Boudreau v. Pierce*, 2011 Ark. App. 457, 384 S.W.3d 664; *Davis v. Sheriff*, 2009 Ark. App. 347, 308 S.W.3d 169. However, as we discuss below, there are no other changes with which to combine the circuit court's finding that LaDonna had developed aggressive behavior and demeanor.

However, unlike the evidence related to LaDonna's discord with Sue, there is no rational basis for determining that LaDonna's drinking was a new phenomenon. The record contains neither any evidence of nor any finding that LaDonna's drinking was different at the time of the hearing than it had been at the time of the divorce decree or that the court had previously been unaware of it. As a result, any finding of changed circumstances based upon her drinking habits is barred by our precedents prohibiting the relitigation of issues that were reasonably before the circuit court at the time of the previous custody order. *Myers*, 2009 Ark. App. 541, at 5, 334 S.W.3d at 881.

The court also considered, as a part of this finding, LaDonna's repeated accusations that Patrick used and abused alcohol. First, we note that the language indicates that the court did not find those accusations credible. This point appears to relate to the court's finding that LaDonna displayed a hostile or aggressive attitude toward Patrick and Sue, which is discussed above. Even if unfounded, we do not believe that LaDonna's allegations against Patrick amount to a material change in circumstances. Additionally, even if the court found that Patrick had remedied his previous drinking problem, based upon testimony that he successfully completed an alcohol treatment program and now rarely drank, it is well settled that a non-custodial parent may not create the change in circumstances upon which modification is based. *Lloyd*, 343 Ark. 620, 37 S.W.3d 603.

### III. The Testimony and Demeanor of [LaDonna's] Current Husband and the Sincere and Credible Testimony of [Patrick] and His Current Wife

The court's third finding as to changed circumstances was the testimony and demeanor of Tony Williams, LaDonna's current husband, and the "sincere and credible" testimony of

SLIP OPINION

Patrick and Sue. This finding fails to articulate any facts or circumstances upon which a change could be found. Instead, it appears to be a credibility finding as to Tony, Patrick, and Sue. It is well settled that we give significant deference to the circuit court's credibility determinations in custody cases because a heavier burden is placed on the trial judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Lowder*, 2014 Ark. App. 704, at 14. However, a credibility determination, on its own, does not create a material change in circumstances. Credibility describes a quality of the witness (the quality of being believable or trustworthy), not an independent fact or circumstance. We know of no precedent indicating that a circuit court may find a material change in circumstances sufficient to warrant custody modification based solely upon a determination that some witnesses were more credible than others. Stated more plainly, we defer to a circuit court's credibility determinations, but those determinations must relate to testimony regarding material facts in order to support a finding of changed circumstances.

As discussed above, we cannot affirm any of the circuit court's three findings as to changed circumstances. While our case law permits us to review the record and determine whether there was sufficient evidence from which the circuit court could have found a change in circumstances, *Campbell*, 336 Ark. at 384, 985 S.W.2d at 727, after a thorough review of the record, we find no independent basis for concluding that a material change in circumstances occurred. Therefore, we reverse on this point.

LaDonna's second argument on appeal is that the circuit court erred in determining that a modification of custody was in the children's best interest. However, based on our holding that

the circuit court's finding that a material change in circumstances occurred was clearly erroneous, any inquiry into the best interest of the children is inappropriate. *Tipton*, 87 Ark. App. at 6, 185 S.W.3d at 145.

Reversed.

ABRAMSON and KINARD, JJ., agree.

*Edwin G. Dooley, Jr.*, for appellant.

*Byars, Hickey, and Hall, PLLC*, by: *Kevin L. Hickey*, for appellee.