SLIP OPINION

Cite as 2015 Ark. App. 306

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV–14–966

| | |
|---|---|
| BRANDI HORTON<br><br>APPELLANT<br><br>V.<br><br>SHAWN RAY PARRISH<br><br>APPELLEE | **Opinion Delivered** MAY 6, 2015<br><br>APPEAL FROM THE FRANKLIN COUNTY CIRCUIT COURT [NO. DR–2010–53]<br><br>HONORABLE GORDON W. "MACK" MCCAIN, JR., JUDGE<br><br>AFFIRMED |

## CLIFF HOOFMAN, Judge

Appellant Brandi Horton appeals from the July 10 and July 30, 2014 orders filed by the Franklin County Circuit Court in favor of appellee, Shawn Ray Parrish. On appeal, appellant's sole contention is that the trial court erred in modifying the divorce decree and awarding appellee custody of the parties' minor children against their best interest. We affirm.

Parrish and Horton were divorced in June 2010. They had four children together, D.P., M.P., K.P., and G.P. The June 8, 2010 divorce decree specifically awarded joint custody of the children "with the Defendant Brandi [Horton] being the primary custodian with reasonable final authority over decisions regarding the children except the primary residence of the children and school enrollment of the children which shall be by unanimous consent of the Parties or order of this Court." The trial court ordered that neither party pay child support and that actual physical custody of the children alternate weekly or as they may agree. If there was a dispute as to holidays or other special occasions, the trial court ordered

that the standard order for visitation would apply. Subsequently, on June 23, 2010, the trial court filed a nunc pro tunc order requiring the children to be enrolled in the Alma School District until graduation or until a court order directs otherwise.

Horton filed a petition for modification of custody on April 10, 2012. In her petition, she alleged that she was seeking modification to allow her to babysit the children when Parrish was working, that Parrish had employed at least nine different babysitters during the last year and a half, that Parrish refused to provide her contact information for each babysitter, and that the trial court should require the parties to agree to each non-immediate family-member babysitter. Parrish filed his answer on April 18, 2012, and filed a counterclaim for contempt and a counter-motion to change custody. Parrish alleged that Horton continually made late payments on the vehicle she was awarded in the decree, causing his credit rating to be adversely affected. Additionally, he alleged that there was a material change in circumstances, that it was in the best interest of the children that he receive full custody with Horton receiving restricted visitation, and that Horton should be required to pay child support.

Horton filed an answer to Parrish's countermotion on April 20, 2012, and an amended petition for modification of custody on May 13, 2013. In her amended petition, she alleged that Parrish had failed to inform her of the children's medical and school issues when they were in his custody; that Parrish had placed the children in an unsafe environment with "guns and knives lying around when the youngest children were not properly supervised"; and that a material change in circumstances had occurred which required the children to be placed in her custody with Parrish paying child support. Parrish filed his response on May 16, 2013,

requesting the dismissal and denial of the amended petition.

A two-day trial was held on October 8, 2013, and May 27, 2014, and the parties had several witnesses testify on their behalf. Gregory Roberts testified that he was a private professional, licensed counselor. On October 8, 2013, he testified that he had seen D.P. five times and had two family sessions with the parents. Horton brought D.P. to him because she found him to be defiant with her and she was having problems controlling him. He opined that D.P. was experiencing a "tic disorder" and attributed it to the dysfunction of the joint-custody arrangement. He further explained that he thought D.P. felt that he was required to have some loyalty for one parent over another and that it was very unhealthy for D.P. As part of the disorder, Roberts testified that D.P. was "pulling his hair out and pulling his fingernails nearly off," indicating the amount of stress that D.P. was experiencing. He further opined that D.P. did not want to decide who he was going to be loyal to and that he felt pressure from Parrish to do so, either directly or inadvertently.

Roberts opined that he did not think joint custody was in the best interest of D.P. and expressed concerns about the children's placement in Parrish's custody. He stated that he was concerned with the lack of communication Parrish had with Horton. However, he did not express the same concerns about placing the children in Horton's custody. After the trial court questioned Roberts regarding whether any of the other children exhibited any problems, Roberts answered that he was not aware of any issues or disorders with the other children. On the second day of the trial, Roberts testified that D.P. had expressed to him that he wished to live with his father, but Roberts still felt that the mother's home was more

appropriate for D.P.

Horton testified that after the divorce, she married Landon Horton. Because Landon had sufficient income, she would be able to stay at home with the children. She testified that she agreed to joint custody only because it was her understanding that she would primarily make the decisions about day-to-day matters. When she discovered that there had been several different babysitters watching the children when Parrish was unable to do so, she not only felt that she was entitled to know the information about who was babysitting the children, but also felt that they would have been better off at home with her rather than with a babysitter. However, if she was not allowed to babysit the children, she felt that the children should be placed in a daycare or preschool, and she testified that she had provided Parrish with a name and phone number of someone she thought was reputable.

Horton further expressed her concerns over the availability of knives and guns while the children were in Parrish's care. When she dropped off one of the children with the babysitter, she observed that her eldest son had a pocket knife that he said was his, and she found a gun in the bedroom upon further inspection of Parrish's home. However, she did not know what type of gun it was. She also disagreed with Parrish's decision to buy the two oldest children pistols for Christmas, when they were only ten and eleven years old.

She testified that Parrish did not provide enough discipline and structure for the children when they were with him. Additionally, she testified that communication with Parrish in general was difficult. For example, Parrish did not tell her that he picked up one son from school sick until later that evening. She testified that if she had known sooner, she

could have made better decisions and told him what he should have done next. She explained that Parrish felt that she was asking for over-communication, but she felt that it could not hurt to "over-communicate" about the children, especially when it was medically or school related.

Parrish admitted that he had nine babysitters; however, he testified that one of the babysitters was his girlfriend and the others were not strangers. In fact, many of them were cousins. Furthermore, since issues were raised regarding the babysitters, he had been having his father babysit the children, and he never witnessed his father say anything negative about Horton in front of the children.

Parrish admitted that he had bought the children two pistols but stated that the children did not own them yet because of their ages. Additionally, he purchased a gun safe about a year-and-a-half prior to his testimony on October 8, 2013. He testified that Horton had expressed her concerns to him about BB guns and air-soft guns being left out. He explained that the incident Horton described during her testimony involved an air-soft gun that was used by the children with the babysitter supervising, that it was emptied as soon as they were finished, and that it was then placed on the bed in its empty state. The babysitter confirmed that it was an air-soft gun during her testimony at trial. Furthermore, Parrish testified that he did not let the children carry the pocket knives all the time and that they are typically locked up. The children had never been hurt by either the air-soft guns or the pocket knives. He further testified that the children did not have access to the guns unless an adult was present.

Additionally, Parrish testified that D.P. had expressed that he wanted to live with him and that he did not want to live with Horton full time. D.P. did not exhibit the same behavioral issues that Horton described while in his custody, and Parrish testified that he had not witnessed D.P. pulling his hair. He also testified that Horton tried to dictate everything that he did with the children rather than accepting the joint-custody agreement, that she would fail to communicate the times for the children's doctor and dental appointments, and that he felt that she was alienating the children from him and his family. He changed his job to allow him to be more flexible and more involved with the children, and therefore, he felt that it was in the best interest of the children to be placed with him rather than with Horton.

Carol Parrish testified that Parrish is her son and that she saw her grandchildren approximately three days a week. She experienced an altercation with Horton regarding the children's visitation with her and her husband. Horton told her that she did not want her to babysit the children and that Carol would never see the children again if she were to gain full custody.

After the trial, the trial court specifically found in its detailed order filed on July 10, 2014, that a material change in circumstances had occurred. Additionally, the trial court made the following specific findings:

> The mother has taken the designation of "primary custodian" and used it as a sword and shield to the detriment of the joint custody arrangement and to the detriment of the children and their relationship with the father.
> This Court's order envisioned equal time with both parents. The mother has used her primary designation to dimi[ni]sh the quality of the father's time with his children through her desire to be in control of each aspect of the children's lives, even when they are not in her care. The evidence submitted by the mother regarding alleged dangerous situations such as guns, knives, air soft guns, four wheeler safety

6

equipment, etc. would leave the uninformed with the impression that the father was unconcerned with the safety of his children. This Court finds his concern in these respects proper and appropriate. However, this Court finds that the mother's assertion that the father is acting inappropriately is an example of her overbearing and controlling nature.

This case was reopened initially based on the mother's demand to be given first right to babysit the children. There was no such provision in the parties' Decree and this Court could have ordered such, but did not.

The mother, by virtue of her most recent marriage has, according to her testimony, no longer the need to work. She has the time to devote to her children that would otherwise have been spent at a place of employment. She adopted the idea that she should thus be entitled to have the children at any time the father was at work. The father rightly refused her request as his lifestyle required continual employment and he had arranged his time with the children to include babysitters. In her pleading and at trial the mother placed much emphasis on the number of babysitters used by the father. I have looked at the testimony and evidence and I find that the father has used relatives when he could. I looked at the duration of each employment period of the various babysitters as well as their geographic location and the resulting impact of travel time. There is nothing that causes me to believe that the father has failed with regard to providing adequate care for his children as same concerns the babysitters, in either number of sitters, quality, or geographic location. Under the circumstances of this case the mother's demand for right of first refusal in babysitting was not within the realm of "reasonable final authority" as it directly and negatively would have impacted the father's share of equal time. This scenario is an example of how the mother uses her designation as "primary custodian" as an offensive weapon. It has certainly been proven to this Court that the mother has very little good to say to or about the father and that she has no respect for his position as parent to those children.

As noted above, the credibility of the witnesses was determined by this Court and the mother's credibility is decreased by her tendency to overreact and over emphasize certain aspects of this case. As an example, she has asserted that the oldest child, [D.P.] has suffered emotionally from the stress of the parents' inability to get along, and she places the blame on the father.

To support this assertion, in her pleadings, testimony, and most recently her post-trial briefs/closing arguments, she claims that [D.P.] has exhibited physical manifestations of the stress by "pulling hair and fingernails out." While this assertion is certainly an attention-getter for any Court, there is simply no evidence to support such activity by the child "post divorce." While there is some evidence of tugging at his hair or picking at his fingernails, this is a far cry from the mother's characterization of the child's actions. As a result of my overall observations, this Court finds that with regard to any point of contention regarding the parties' recollection of events the father is found to be more credible, and thus his testimony is afforded more weight.

It is worthy of note that [D.P.'s] counselor, while in support of the mother's case, pointed out that [D.P.] had issues. However, the counselor was never able to clearly assert that [D.P.'s] issues resulted only from his environment and not from some malady personal only to the child. The mother places a large amount of emphasis on [D.P.'s] issues and asserts that the problems are a result of the father's failures. There are four children between these parties and there is no evidence of any of the other children experiencing hair pulling, hair tugging, nail picking or fingernail removal. Further, the mother's assertion that the father has worked to alienate [D.P.] from her and to reduce her authority is unfounded.

VII.

I find that it is in the best interest of the children that the previous Order of this Court be modified. Equal time, joint custody is not workable between these parties. In determining the best interest of the children, with regard to custody, I adopt, as if set out herein, my findings in the previous sections of this Order. In addition, I find that, as between the two parents, the mother is less likely to foster a positive relationship should she be given full custody of the children. Of note in this regard is the allegation that the mother stated to the paternal grandparents that "if she (mother) received custody they would not see the children." Of all the testimony I heard in this case the most credible was of the paternal grandmother's recollection of this statement. I find the mother said it, that she meant it, and her history of control would result in her carrying out the threat to whatever extent she had available to her as the custodial parent.

Horton filed a motion for reconsideration and new trial on July 16, 2014. After Parrish filed a response on July 23, 2014, the trial court filed a detailed order denying the motion for new trial on July 30, 2014. On August 25, 2014, an agreed amended order was entered, specifically addressing the amount of child support and the method for payment. However, the order noted that any other provisions not specifically amended remained in full force and effect. This timely appeal followed.

In reviewing child-custody cases, we consider the evidence de novo, but we will not reverse the trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *McNutt v. Yates*, 2013 Ark. 427, 430 S.W.3d 91. It is well

settled that the primary consideration is the welfare and best interest of the child, while other considerations are merely secondary. *Id.* We give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases, and this deference to the trial court is even greater in cases involving child custody, as a heavier burden is placed on the trial court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.*

The party seeking modification of the custody order has the burden of showing a material change in circumstances. *Evans v. McKinney*, 2014 Ark. App. 440, 440 S.W.3d 357. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. *Id.* Once the trial court determines that the threshold requirement of a material change in circumstances since the last order of custody has been met, the trial court must then determine who should have custody with the sole consideration being the best interest of the children. *Id.* The factors that a trial court may consider in determining what is in the best interest of the children include the psychological relationship between the parents and children, the need for stability and continuity in the relationship between parents and children, the past conduct of the parents toward the children, and the reasonable preference of the children. *Bamburg v. Bamburg*, 2014 Ark. App. 269, 435 S.W.3d 6.

On appeal, appellant's sole contention is that the trial court erred in modifying the

divorce decree and awarding appellee custody of the parties' minor children against their best interest. Appellant does not contest the trial court's finding that there was a material change in circumstances. Instead, she disagrees with the trial court's findings as to best interest and argues that she should have been awarded custody. Because there are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry a greater weight than those involving the custody of minor children, our deference to the trial court in matters of credibility is correspondingly greater in such cases. *Evans*, *supra*. Here, the trial court specifically found that Parrish's and the paternal grandmother's testimony was credible and afforded a greater weight. Furthermore, the trial court found that Horton was less likely to foster a positive relationship if she were to be given full custody of the children. Thus, based on the record before us and our standard of review, we cannot hold that the trial court committed clear error in its determination.

Affirmed.

VAUGHT and BROWN, JJ., agree.

*Worsham Law Firm, P.A.*, by: *Richard E. Worsham*, for appellant.

*Susan M.J. Wakefield*, for appellee.