

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-15-972

| | |
|---|---|
| CYNDAL DUNN<br>APPELLANT<br><br>V.<br><br>ROBERT J. ROBINS<br>APPELLEE | **Opinion Delivered:** June 1, 2016<br><br>APPEAL FROM THE LAWRENCE COUNTY CIRCUIT COURT<br>[NO. DR-09-75]<br><br>HONORABLE PHILIP SMITH, JUDGE<br><br>AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant appeals from the circuit court's denial of her petition to modify custody of C.R., born 12/13/07. Appellant argues on appeal that the circuit court erred in finding that (1) there was no material change in circumstances and (2) it was not in C.R.'s best interest to live with appellant and her new husband. We affirm.

On May 13, 2009, the circuit court entered an agreed order granting both parties joint custody of C.R., alternating two-week time periods with C.R. All decisions and expenses involving C.R. were to be shared equally and neither party was ordered to pay child support.

On September 10, 2012, the circuit court entered an agreed order finding that a "material and substantial" change in circumstances had occurred justifying modification of the May 13, 2009 custody award. While the parties continued to have joint custody of C.R., primary legal and physical custody was awarded to appellee. Appellant was awarded visitation; she was not ordered to pay child support.

Appellant filed a petition to modify the agreed custody arrangement on May 2, 2013, alleging that "[i]mmediately after" entry of the last order, appellee and his wife "began a course of conduct designed to harass [appellant] in her exercise of visitation, designed to break the parental bond between the [appellant] and the minor child [C.R.] and to frustrate her visitation with the minor child." Accordingly, appellant sought custody of C.R. Appellee responded on May 30, 2013, seeking dismissal of appellant's petition to modify custody.[1] Appellant answered appellee's counterclaim denying each and every material allegation therein.

On April 28, 2014, appellant filed an amended complaint adding the allegation that appellee was going through a divorce that was adversely affecting C.R. Appellee responded denying that allegation in his answer filed on May 22, 2014.

A hearing on appellant's petition to modify custody was held on August 11, 2015. Appellant testified that she originally consented to joint custody with physical custody to appellee because she was "not in good health at the time[,]" and she was not employed, having just completed her associate's degree. Her health problems were now better. She was a stay-at-home mother. Additionally, appellant had been married since 2013 and her husband was very active in his support of and interaction with C.R. She denied having a drug problem.

---

[1] Appellee filed a counterclaim on May 30, 2013, asserting a "substantial material change in circumstances" that necessitated appellant paying child support. Appellee's counterclaim was disposed of by the same order; however, appellee did not appeal the decision. Accordingly, we do not address appellee's counterclaim herein.

Appellant asserted that C.R.'s "70 year old grandmother [was] basically raising [C.R.] instead of [appellee]" due to appellee's work schedule and in light of his divorce. She stated that appellee had relied on his ex-wife, Geneva Virginia Hurst, "very much" in raising C.R. because of his work schedule. Since the divorce, appellee's mother kept C.R. "pretty much every day." She thought appellee's mother was "great[,]" but that C.R. needed to be with her parents. She stated that Hurst encouraged C.R. to call appellant by her first name, had been convicted of stealing appellant's mail and vandalizing her mailbox, and had confessed to an investigator that "she pretended to [be appellant] and shut [her] electricity off." Appellant did not know if appellee knew Hurst was vandalizing appellant's mailbox.

Appellant further testified that appellee did not communicate with her "very much at all about [C.R.'s] well-being." Appellee had told her that he did not give C.R. medicine daily as prescribed for her. She believed that appellee had not "fostered" C.R.'s relationship with appellant. She stated that appellee allowed her and C.R. to talk on the phone and gave her the minimum visitation with an extra day per week. She admitted that appellee had "some stability" and that he "deserve[d] credit" for C.R.'s academic accomplishments.

Appellant's husband, Alex Francis, testified regarding his relationship and interaction with C.R., which was all positive. Mary Moody, appellant's friend, testified that things had changed with appellant so that she was healthier and happier. Donna Gay Dunn, appellant's mother, testified that appellant's health problems had improved "[f]or the most part . . . a whole lot" and that Francis loved C.R. Charles Dunn, appellant's father, testified that appellant had "grown up quite a bit[,]" and while he admitted that he had "suspected" that

appellant was taking his wife's prescription drugs, having kicked appellant out of their home at one time because of the suspicion, he stated that he had "apparently" misplaced the drugs.

Appellee testified that Hurst had been active in helping him raise C.R. during their marriage. He denied that he encouraged Hurst to vandalize appellant's mailbox, steal her mail, or shut off her electricity; he denied knowing she was doing these things. He averred that this conduct by Hurst was one of the circumstances that led to their divorce; however, he did not think Hurst's "mistake" should bar her from having a relationship with C.R. He denied that he or Hurst had told C.R. not to call appellant "mother" and stated that when he heard C.R. call Hurst mom, he "tried to put a stop to that." Though he admitted "badmouthing" appellant to Hurst, he denied that C.R. heard him, stating that there was "absolutely no chance" C.R. had heard him.

Appellee admitted that his mother was "pretty much" taking care of C.R. "four days one week and three days the next week[,]" noting that this arrangement was "regular." During the summer, C.R. stayed with his parents while he worked, but only "an hour, hour and half, tops" during the school year. He denied that C.R.'s prescription was to be taken daily, stating that it was to be taken as needed. However, when presented with the prescription filled July 15, 2015, he admitted that it said daily and that "as needed" was not consistent with taking the prescription daily. He stated that he had "not read [that] prescription before." He then referred to a September 8, 2010 report stating that the same prescription was to be given "PRN[,]" which he said meant to take as needed. He averred that he did not give C.R. the medication every day because C.R. "gets really bad diarrhea

bad enough that it causes accidents" when he does. C.R.'s constipation was "under control pretty much now."

Though divorced, appellee admitted to having "been out" with Hurst "maybe as many as ten times" since their divorce; however, he denied having plans to reconcile with Hurst. He "absolutely believed he foster[ed] a relationship" between C.R. and appellant, noting his flexibility with visitation and the length of phone calls between C.R. and appellant. He testified that he had done an "outstanding job as a single father[,]" noting the various ways that C.R. was essentially a well-rounded young lady. He denied that his work interfered with his ability to raise C.R. He denied that his mother was "raising" C.R., stating that someone had to watch C.R. while he was at work and he "never wanted to use a daycare" because he trusted the care C.R. received from his mother.

Hurst testified to admitting to an investigator that she was taking appellant's mail from her mailbox; she also ran it over. She denied badmouthing appellant to C.R. She also denied having anything to do with appellant's electricity being shut off. She testified that she never told appellee about any of her actions against appellant. She noted that C.R. called her and they talked on the phone and denied that she and appellee were dating, stating that they "remained to have a good relationship." Finally, she stated that she loved C.R. and treated C.R. "like [her] own daughter."

Appellee's mother, Carol Robins, testified that she babysits C.R. while appellee is at work; she is not raising C.R. She testified to the details of her babysitting arrangement with appellee and how those arrangements changed when his hours changed.

The circuit court ruled from the bench that it was denying appellant's motion to change custody, noting her failure to present material changes in the life of appellee, as the custodial parent, that would make change of custody in the best interest of C.R. An order reflecting the same was entered on August 26, 2015. This timely appeal followed.

Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the child; all other considerations are secondary.[2] Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody in order to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues.[3]

The party seeking modification of the custody order has the burden of showing a material change in circumstances.[4] In order to change custody, the trial court must first determine that a material change in circumstances has occurred since the last order of custody; if that threshold requirement is met, it must then determine who should have custody with the sole consideration being the best interest of the child.[5] Determining whether there has been a change of circumstances requires a full consideration of the circumstances that existed when the last custody order was entered in comparison to the

---

[2] *Geren Williams v. Geren*, 2015 Ark. App. 197, at 10, 458 S.W.3d 759, 766 (citing *Harris v. Harris*, 2010 Ark. App. 160, 379 S.W.3d 8).

[3] *Id.* (citing *Grisham v. Grisham*, 2009 Ark. App. 260).

[4] *Evans v. McKinney*, 2014 Ark. App. 440, at 4, 440 S.W.3d 357, 359 (citing *Anderson v. Thomas*, 2013 Ark. App. 653).

[5] *Id.*

circumstances at the time the change of custody is considered.[6] The factors that a trial court may consider in determining what is in the best interest of the child include the psychological relationship between the parents and child, the need for stability and continuity in the relationship between parents and child, the past conduct of the parents toward the children, and the reasonable preference of the child.[7] In reviewing child–custody cases, we consider the evidence de novo, but will not reverse a circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence.[8]

Appellant's first argument on appeal is that the circuit court erred in finding that there was no material change in circumstances, specifically arguing that Hurst's crime against appellant, appellee's divorce from Hurst and then dating Hurst after the divorce, appellee's work schedule, and various improvements in appellant's life are material changes in circumstances. We disagree.

## I. *Hurst's Property Crime Against Appellant*

Appellant cites *Davis v. Sherriff* for the holding that a crime alone can be a material change in circumstances.[9] That case is distinguishable. In *Davis*, the stepfather had pled no contest—which was treated as a conviction—to endangering a minor, for harm he imposed

---

[6] *Geren Williams*, 2015 Ark. App. 197, at 10–11, 458 S.W.3d at 766 (citing *Carver v. May*, 81 Ark. App. 292, 101 S.W.3d 256 (2003)).

[7] *Horton v. Parrish*, 2015 Ark. App. 306, at 9, 461 S.W.3d 718, 724 (citing *Bamburg v. Bamburg*, 2014 Ark. App. 269, 435 S.W.3d 6).

[8] *Evans*, *supra* (citing *Preston v. Preston*, 2014 Ark. App. 58).

[9] 2009 Ark. App. 347, at 8, 308 S.W.3d 169, 173.

on his son from a previous marriage. This court found that the fact that the stepfather disputed the factual basis for the charge to which he pleaded no contest could not refute the fact that he had been convicted of a crime involving harm to a minor child.[10] *James v. James*, also cited by appellant, is also factually distinguishable.[11] This court found that the circuit court had erred in disallowing evidence that the custodial parent had committed the crime of embezzlement while serving in the fiduciary capacity of personal representative of his father's estate; his actions had deprived his mother and sister of their inheritance, which totaled more than $215,000. In reversing, this court found that the proffered evidence of the custodial parent's actions reflected adversely on his moral character and "[t]he morality of a parent is relevant to the best interest of the children and to the issue of parental custody."[12]

In the case at bar, appellee's ex-wife vandalized appellant's mailbox; there was no evidence of any other convictions. Hurst testified that that action was a "mistake" that had "caused discord in [her] marriage." The circuit court agreed that Hurst had made a "stupid mistake[,]" but went on to state that "[f]rom everything [it could] tell, before she made the mistake she was a good stepmother for the child, apparently." Furthermore, despite appellee's continued, undefined relationship with Hurst, appellee testified that Hurst's conviction was "one of the circumstances that led to" his divorce from Hurst. The circuit

---

[10] *Id.*

[11] *James v. James*, 29 Ark. App. 226, 780 S.W.2d 346 (1989).

[12] *Id.*, 29 Ark. App. at 228, 780 S.W.2d at 347 (citing *Nix v. Nix*, 17 Ark. App. 219, 706 S.W.2d 403 (1986)).

court apparently found this testimony credible as it noted in its ruling from the bench that the conviction "played a part in the divorce." It went on to state, regarding Hurst's appearance during her testimony, that it "saw a lady sitting up here that is very, not mad, very sad, very sorry for what she did." This court cannot find that appellee's allowance of Hurst to continue a relationship with C.R., despite her conviction, reflected adversely on his moral character.

Hurst testified that she treated C.R. "like [her] own daughter." Appellant put forth no evidence tending to contradict that assertion. The circuit court did not err in finding that Hurst's criminal conviction did not constitute a material change in circumstance.

## II. *Changes in Appellant's Life*

Appellant cites *Walker v. Torres* for the holding that changes in the non-custodial parent's life, including remarriage, can be considered as material changes in circumstances when coupled with changes in the custodial parent's life. [13] In that case, this court stated the following:

> [I]n a recent opinion, this court addressed the issue of a material change in circumstances based upon a major change in circumstances on the part of the noncustodial parent coupled with a minor change in the circumstances of the custodial parent. In *Mason v. Mason*, this court affirmed the decision of the trial court to change custody based on "radical and positive change" in the noncustodial parent's circumstances coupled with "evidence of a further decline in [the custodial parent's] already dismal circumstances."[14]

---

[13] 83 Ark. App. 135, 118 S.W.3d 148 (2003).

[14] *Id.* at 140, 118 S.W.3d at 152 (citing *Mason v. Mason*, 82 Ark. App. 133, 111 S.W.3d 855 (2003)).

In *Walker*, the custodial parent, Lesly Walker Torres had been cohabitating with a convicted felon; had had multiple jobs, including two from which she had been terminated; was withholding visitation between Walker and the child; and had failed to provide a phone number to Walker for phone calls between him and the child. Meanwhile, Walker had remarried, was taking classes at night, and was able to explain his accrual of child-support arrearages as employer error after changing jobs, among other things. This court reversed the circuit court's denial of Walker's motion for change of custody. The case before this court is distinguishable from *Walker*.

This case is like *Walker* in that there was improvement in the circumstances of appellant, the noncustodial parent; she remarried, became a stay-at-home mom, and improved her health concerns. However, unlike *Walker*, there was no obvious decline in the circumstances and environment of appellee. While appellant criticized the amount of time C.R. spent with appellee's mother, she admitted that she had no problem with appellee's mom—making no allegations of problems during the time his mom babysat C.R.—and admitted that appellee "deserve[d] credit" for the positive child C.R. was. The circuit court specifically found that C.R. was "well-adjusted" and had "a good relationship with her mama and her daddy and the other people that pay attention to her and care for her." It went on to state "[y]ou cannot say that in either place the child is in any danger whatsoever and has anything other than a loving, wonderful family to support her." Finally, it said, "[w]hen you have got something going on where a child is doing as well as this one is, all I can say to you is keep on doing it."

Appellant asserts that the circuit court should have considered her remarriage to be a factor "[a]t the bare, absolute minimum." This argument assumes that the circuit court did not consider the same; however, the circuit court stated from the bench that "you can be very thankful that this man [Francis] is involved in the child's life." The court's failure to find her remarriage to be a material factor does not mean the circuit court did not consider it. A change in circumstances of a noncustodial parent, standing alone, does not justify a change of custody.[15] The circuit court did not err in finding that changes in appellant's own circumstances did not constitute a material circumstance.

### III. *Appellee's Divorce and Grandmother's Babysitting*

Appellant essentially argues that appellant's divorce from Hurst caused him to rely on his mother heavily for babysitting to the point that his mother was "raising" C.R. Appellant's own brief states that appellee worked the night shift, requiring his mother to babysit overnight, "every seven out of fourteen days." She noted that C.R. had to get up at 3:30 a.m. to go to appellee's mother's house, but admitted that appellee would get off work at 1:30 p.m. Despite the inconvenience of getting up at 3:30 a.m., which the circuit court noted, the evidence showed that C.R. was only with appellee's mother when he was working during the summer and that those hours coincided with the hours that C.R. would be in school during the school year. During the school year, appellee's schedule made it so C.R. was not spending more than an hour and a half "tops" with appellee's mother after

---

[15] *Harral v. McGaha*, 2013 Ark. App. 320, at 9, 427 S.W.3d 769, 775 (citing *Walker, supra*).

school. The circuit court did not err in finding that appellee's work schedule did not constitute a material change in circumstance.[16]

Because we hold that the circuit court did not err in finding that appellant failed to prove a material change in circumstances, we do not address appellant's best interest argument. We affirm.

Affirmed.

HARRISON and WHITEAKER, JJ., agree.

*Devon N. Holder*, for appellant.

*Scott Emerson, P.A.*, by: *Scott Emerson*, for appellee.

---

[16] To the extent appellant argues that allowing contact between C.R. and Hurst after appellee's divorce from Hurst was a material change in circumstances because the divorce "no doubt affected . . . [C.R.] emotionally in a negative way[,]" added "an element of uncertainty and instability in [appellee's] future[,]" and added "a likelihood of stress and anxiety between all parties involved[,]" this has already been addressed in section I.